Richard BEAULIEU, Appellant,

v.

James V. ELLIOTT, Appellee.

James V. ELLIOTT, Appellant,

v.

Richard BEAULIEU, Appellee.

Nos. 765, 766.

Supreme Court of Alaska.

Dec. 5, 1967.

James J. Delaney, Jr., and James K. Singleton, of Delaney, Wiles, Moore & Hayes, Anchorage, for appellant in No. 765 and appellee in 766.

Robert M. Libbey, of Kay, Miller, Jacobs & Libbey, Anchorage, for appellee in No. 765 and appellant in 766.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

## OPINION

DIMOND, Justice.

As a result of an automobile accident on April 13, 1963, James Elliott suffered a fracture dislocation of his right ankle. He brought this action for damages against Richard Beaulieu. Liability was conceded by Beaulieu, and the issue of damages was tried by the court without a jury. The trial court filed findings of fact and conclusions of law and entered judgment awarding Elliott $169,937.25 compensatory damages, costs of $82.40, and attorney's fees in the amount of $13,870.29. Both parties have appealed. We shall consider first Beaulieu's appeal.

### Beaulieu's Appeal

In his brief on appeal, Beaulieu states 21 specifications of error. These resolve themselves into six principal issues to be reviewed and determined by this court.

### 1. Impairment of Earning Capacity.

There is no question but that Elliott suffered a permanent injury. The fracture dislocation of his right ankle, after several unsuccessful operations, resulted in a lack of a true ankle joint per se. As Dr. Scholtens said: "There is simply a ragged margin of rather schlerotic bone." He also stated, "It's not a joint any more but it's just a couple of pieces of bone grating against each other." Dr. Wichman testified that the joint was such that Elliott's ankle could be used only as a "peg". In

addition, osteomyelitis developed in the ankle bone and both Shelton and Foster testified that the reasonable medical probabilities were that such disease would continue for the remainder of Elliott's life.

In its third conclusion of law the trial court stated:

That plaintiff will suffer a future wage loss in the amount of $80,440.40, after taking into consideration the fact that his wage earning capacity has been impaired to the extent of fifty (50%) per cent plus the further fact that his rate of pay at the time of discharge was $462.30 per month and plus the further fact that he has a remaining work life of twenty-nine (29) years.[1]

Beaulieu contends that there is no evidence to support the court's determination that Elliott suffered an impairment of earning capacity which would result in a loss of future wages.

On this point we must remand the case to the trial court for the making of more explicit findings of fact. The court's conclusion as to loss of future wages contains the implicit finding that Elliott's wage earning capacity had been impaired for the remainder of his work life of 29 years. The court gives no indication, however, of the factual basis for such an ultimate finding, nor does it indicate how it reconciles such a finding with the testimony of two physicians who spoke on the subject of Elliott's capacity to be gainfully employed. Dr. Foster testified that in his opinion, while Elliott was unable to work at the time of the trial in 1966, this inability would at the most only continue from one to five years, and that the condition of Elliott's ankle would steadily improve so that within that period of time he would be able to engage in a sedentary type of occupation that would not involve prolonged walking, running or heavy lifting. It was Dr. Foster's opinion that Elliott's future earning capacity was impaired only to the extent that he must now do clerical work rather than truck driving which he had done prior to 1963. Dr. Wichman testified that the prognosis of the condition of Elliott's ankle was satisfactory, that he would be limited in many activities because he would have to use his ankle as a peg and would be deprived of the movements that a normal ankle offers, that it would be possible for him to be gainfully employed in a sedentary type of occupation, but that he could not give an estimate as to when that might be because he did not know how much dead bone was present in the ankle.

As to the extent of impaired earning capacity, the court reached the conclusion that there was a 50% impairment. But the court does not say how it arrived at that figure. And we are unable to tell from our review of the record.

Conceivably, the court's determination of a percentage impairment was influenced by Elliott's testimony that he had received a medical discharge from the United States Air Force in January of 1966, and that he was receiving from the government a 60% disability compensation, 40% of which was attributable to his ankle, and the remaining 20% to other medical problems not related to the accident. That this may have influenced the court appears to be a possibility, because the court made Finding of Fact No. 19 which provided as follows:

That on October 17, 1964, plaintiff was discharged from the hospital to "travel status"; that on January 14, 1966, plaintiff was given a medical discharge from the Air Force, as above mentioned; that the physical evaluation board, found plaintiff to be 60% disabled, assigning a 40% disability because of the injuries

---

1. The pertinent part of Conclusion of Law No. 3 originally read:

That plaintiff will suffer a future wage loss in the amount of $80,440.40, after taking into consideration the fact *that his disability is 50%.* * * * [Emphasis added.]

The italicized words were amended by the court on Elliott's motion to read: "that his wage earning capacity has been impaired to the extent of fifty (50%) per cent."

to plaintiff's right ankle, a 10% disability to a "depressive reaction" and a 10% disability due to an impairment of vision; that the latter disability is not related to the accident of April 13, 1963.[2]

■ If the court based its conclusion as to degree of impairment of earning capacity upon certain findings of an Air Force physical evaluation board, this would have been error. The findings or judgment of a quasi-judicial administrative agency in proceedings before it are not admissible in a subsequent action against a person not a party to such proceedings.[3]

The trial court also may have been influenced in its determination of the existence of a 50% impairment of earning capacity by what Elliott characterizes as admissions made by Beaulieu's trial counsel. In his opening statement at the trial, counsel for Beaulieu admitted that Elliott had sustained a "permanent injury", that this did not render him 100% disabled, and that the question for determination was just how much "he will lose in the future because of the injury." In his brief filed subsequent to the close of the trial Beaulieu's counsel said this:

> In summary, it is suggested by the defense that the Court make its award to the Plaintiff on the basis of the figures set forth below. These figures take into consideration: The prognosis established by the medical experts; the 60% disability rating established by the Air Force, of which 50% is attributable to Plaintiff's ankle injury; and, the Plaintiff's ability to be gainfully employed in the future as a clerk or transportation specialist in the transportation industry, or as a travel agent.
>
> * * * [I]t is * * * suggested that the following award be made:

| | |
|---|---|
| For past lost wages ................. | $10,000.00 |
| For future "lost wages", or diminution of earning capacity, based on 50% disability rating for the next five years ... | 11,500.00 |
| For past pain and suffering ........... | 5,000.00 |
| For future pain and suffering ........ | 10,000.00 |
| For permanent disability and injury to ankle ............................ | 25,000.00 |
| Total ............... | $61,500.00 |

◆

■ It is true that admissions of fact by counsel during the course of the trial are binding on his client,[4] if they are made with the express purpose of dispensing with the formal proof of some fact at the trial, and are thus used as a substitute for legal evidence of the fact.[5] It does not appear that this was the purpose of counsel's statement in his brief filed subsequent to the trial. But even if it did constitute an admission of fact binding on Beaulieu, it is an admission only that Elli-

2. Apart from Elliott's testimony just mentioned, we do not know where the trial court obtained information regarding the findings of the Air Force physical evaluation board. Such findings were not introduced into evidence at the trial.

3. Cady v. Fraser, 122 Colo. 252, 222 P.2d 422, 425 (1950).

4. Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912, 916–917 (7th Cir. 1953), cert. denied, 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954), reh. denied, 347 U.S. 979, 74 S.Ct. 784, 98 L. Ed. 1118 (1954), reh. denied, 348 U.S. 851, 75 S.Ct. 19, 99 L.Ed. 671 (1954).

5. Dodge v. Stencil, 48 Wash.2d 619, 296 P.2d 312, 314 (1956); Humble Oil & Refining Co. v. Sun Oil Co., 191 F.2d 705, 714 (5th Cir. 1951), cert. denied, 342 U.S. 920, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

ott's earning capacity had been 50% impaired for a period of five years, and not for the remaining work life of Elliott of 29 years as found by the trial court. Consequently, what Beaulieu's counsel said in his brief does not satisfactorily explain or establish the basis for the trial court's Conclusion of Law No. 3 which dealt with impairment of earning capacity.

■■ It is most important that the trial court comply meticulously with the requirements of Civil Rule 52(a) [6] with respect to the making of findings of fact in order to give us a clear understanding of the basis of the trial court's decision, and to enable us to properly appraise the elements which entered into the court's award of damages.[7] This was not done in this case. Our review of the record leaves us with the conclusion that the trial court's findings with respect to damages for future impairment of earning capacity are not sufficiently detailed to afford us a clear understanding of the basis for the court's award.[8] We therefore will remand this case to the trial court for the purpose of making detailed and explicit findings as to Elliott's earning capacity and the degree of impairment in respect thereto.[9]

In his Finding of Fact No. 19 the trial court referred to the fact that the Air Force physical evaluation board had found Elliott to be 60% disabled, and that 10% of that disability was due to a "depressive reaction". In Finding of Fact No. 22 the court stated that a psychiatric evaluation of Elliott had been made, that the psychiatric findings were that Elliott had developed a depressive reaction attributable to permanent crippling, deformity of the lower ex-

tremity, semi-isolation, and a protracted period of surgery and recovery, and that such depressive reaction was proximately caused by the accident of April 13, 1963. Beaulieu contends that the judge used the Air Force physical evaluation board's findings to award Elliott $16,088.00 for that part of his impaired earning potential caused by a depressive reaction, and that this was error.

■ We are unable to review this point because nowhere in the court's finding of fact or conclusions of law or judgment is there any mention of an award of $16,088.-00 for a depressive reaction as an element of Elliott's impaired earning capacity. It may be that the trial court intended that of the 50% impairment of earning capacity which is found to exist, 10% was due to a depressive reaction. However, we are unable to determine if that is the case from the record as it now exists. This point should be clarified on a remand of the case for more detailed and explicit findings of fact.

2. *Future Wage Loss—Present Value.*

The trial court did not reduce the amount it found as damages for future impairment of earning capacity to present value. Instead, the court stated that "The interest rate reduction and decline in purchasing power of the dollar is off-set by pay increases plaintiff could have expected in the future from his military service." Beaulieu contends that the failure to reduce the damages to present value was prejudicial error.

■ The general principle underlying the assessment of damages in tort cases is that an injured person is entitled to be

6. Civ.R. 52(a) provides in part:
   In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment * * *.

7. *Patrick v. Sedwick*, 413 P.2d 169, 174–176 (Alaska 1966); *Hamilton v. Lotto*, 391 P.2d 948, 949 (Alaska 1964); Spe-

nard Plumbing & Heating Co. v. Wright Const. Co., 370 P.2d 519, 525–526 (Alaska 1962); *Merrill v. Merrill*, 368 P.2d 546, 548 (Alaska 1962); *Dickerson v. Geiermann*, 368 P.2d 217, 219 (Alaska 1962).

8. *Patrick v. Sedwick*, note 7 supra, 413 P.2d at 175.

9. *Patrick v. Sedwick*, note 7, supra, 413 P.2d at 176.

replaced as nearly as possible in the position he would have occupied had it not been for the defendant's tort.[10] In the case of impairment of future earning capacity, it is reasoned that a failure to reduce damages to present value would be to place the injured person in a better position than he would have occupied except for the defendant's tort, because the injured person would get all of his future wages long in advance and would be able to invest the lump sum and realize earnings on such investment during the intervening period.[11] For this reason—that money has the power to earn money—it has become the generally accepted rule that damages awarded for future loss of earnings should be reduced to present worth.[12]

In applying the general rule, the Supreme Court of Washington has stated a formula for reducing awards of future earnings to present value which involves the "rate of interest (which) could fairly be expected from safe investments which a person of ordinary prudence, but without particular financial experience or skill, could make in that locality." [13] This formula, although empirical at best, is probably as definite as any that has been devised. But we believe that the rule for reducing awards, including the formula applied by the Washington court, ignores facts which should not be ignored. Annual inflation at a varying rate is and has been with us for many years. There is no reason to expect that it will not be with us in the future. This rate of depreciation offsets the interest that could be earned on government bonds and many other "safe" investments. As a result the plaintiff, who through no fault of his own is given his future earnings reduced to present value must, in order to realize his full earnings and not be penalized by reduction of future earnings to present value, invest his money in enterprises, other than those which are considered "safe" investments, which promise a return in interest or dividends greater than the offsetting rate of annual inflation. But ours is a competitive economy. By their very nature some enterprises backed by investors' money are going to fail with resulting loss to individuals. Thus, instead of being assured of earnings at rates greater than the annual rate of inflation, the injured plaintiff stands a chance of entirely losing his future earnings by unlucky or unwise investments. Since the plaintiff, through the defendant's fault and not his own, has been placed in the position of having no assurance that his award of future earnings, reduced to present value, can be utilized so that he will ultimately realize his full earnings, we believe that justice will best be served by permitting the trier of fact to compute loss of future earnings without reduction to present value. The plaintiff is more likely to be restored to his original condition under the rule we adopt than under the prevailing rule which calls for a discounting of the award for future earnings.

Our conclusion is fortified by another factor which also may not be ignored. This is the factor, relied upon by the trial judge, which involves wage increases that the injured plaintiff might have expected to receive in the future had he not been injured.

10. Hill v. Varner, 4 Utah 2d 166, 290 P. 2d 448, 449 (1955); Restatement, Torts § 924 comment d, at 634–35 (1939); McCormick, Damages § 86, at 304 (1935). Accord United States v. Hatahley, 257 F.2d 920, 923, 79 A.L.R.2d 668 (10th Cir. 1958); Hughett v. Caldwell County, 313 Ky. 85, 96, 230 S.W.2d 92, 21 A.L.R.2d 373 (1950).

11. McCormick, Damages § 86, at 304 (1935).

12. Wentz v. T. E. Connolly, Inc., 45 Wash. 2d 127, 273 P.2d 485, 491 (1954); Bor-

cherding v. Eklund, 156 Neb. 196, 55 N. W.2d 643, 650 (1952); Daughtry v. Cline, 224 N.C. 381, 30 S.E.2d 322, 324, 154 A.L.R. 789 (1944); Rigley v. Prior, 290 Mo. 10, 233 S.W. 828, 832 (1921); Restatement, Torts § 924 comment d, at 634–35 (1939); McCormick, Damages § 86, at 304 (1935); Annots., 77 A.L.R. 1439, 1446 (1932) 154 A.L.R. 796, 797 (1945).

13. Wentz v. T. E. Connolly, Inc., supra note 12, 273 P.2d at 492.

It is a matter of common experience that as one progresses in his chosen occupation or profession he is likely to increase his earnings as the years pass by. In nearly any occupation a wage earner can reasonably expect to receive wage increases from time to time. This factor is generally not taken into account when loss of future wages is determined, because there is no definite way of determining at the time of trial what wage increases the plaintiff may expect to receive in the years to come. However, this factor may be taken into account to some extent when considered to be an offsetting factor to the result reached when future earnings are not reduced to present value. Thus, if there is any fear that failure to reduce the present value will give the plaintiff more than he is entitled to because of the possibility of his making successful investments of the sum awarded at returns greater than the annual rate of inflation, such fear is obviated by the fact that the award may well be deficient in that it does not take into account probable wage increases that the plaintiff would ordinarily be expected to receive in the future.

### 3. Retirement Pay.

Elliott testified that he would receive disability retirement pay from the Air Force in the amount of $191.00 a month for the remainder of his life. Beaulieu contends that the trial judge committed prejudicial error in refusing to deduct the net present value of future retirement pay from the award for future loss of earnings. Beaulieu's argument is that to allow Elliott damages for future wage loss, in addition to his retirement pay, is to unjustly enrich Elliott by allowing him double compensation for his injuries.

The general principle underlying the assessment of damages in tort cases is that an injured person is entitled to be replaced as nearly as possible in the position he would have occupied had it not been for the defendant's tort.[14] Elliott had been in the Air Force for about 18 years at the time of his discharge and he testified that he had intended to remain in the service for at least 20 years. If he had not been injured, Elliott could have continued to earn to his full capacity and, in addition, after 20 years' service, would have been entitled to retire and draw retirement pay.[15] By reason of his injuries, Elliott was entitled under law to be retired early for disability and draw retirement pay in lieu of retirement on a regular basis after completion of 20 years' service.[16] The award of damages for impaired earning capacity has the effect of putting Elliott in the same position he would have occupied had it not been for the injury, because the damages represent what Elliott could have earned had he not been injured and the disability retirement pay represents that which Elliott had earned and become entitled to under law by reason of his years of service in the Air Force. In other words, Elliott now receives an amount representing wages he could have earned were it not for the injury, plus retirement pay; had he not been injured, he would have received the full wages he could have earned during his remaining work life, in addition to receiving the retirement pay to which he would become entitled by reason of his years of service in the Air Force. Thus, Elliott, under the court's award, is getting no more than he would have gotten had he not been injured. The disability retirement pay Elliott is receiving should not be used to mitigate damages and reduce the award for loss of future earnings.

### 4. Income Taxes.

Beaulieu argues that the trial judge erred in failing to deduct from the damages awarded for impairment of future earning capacity an amount representing income taxes that Elliott would have had to pay on future income.

The courts are divided on this question. It is the more general view, supported by a

---

14. Note 10 supra.

15. 10 U.S.C.A. §§ 8914, 8889, 8991 (1959).

16. 10 U.S.C.A. §§ 1201, 1401 (1959).

majority of American decisions, that an amount representing future income taxes should not be deducted from the award.[17] As was stated by the Supreme Court of Rhode Island:

This view has been adopted by the various courts on diverse grounds but primarily on the ground that the quantum of such taxation is of necessity in the realm of conjecture.[18]

■ We adopt the majority rule. Income tax rates, provisions relating to deductions and exemptions, and other aspects of income tax laws and regulations are so subject to change in the future that we believe that a court cannot predict with sufficient certainty just what amounts of money a plaintiff would be obliged to pay in federal and state income taxes on income that he would have earned in the future had it not been for a defendant's tortious conduct. We hold that a damage award for impairment of earning capacity should not be reduced by an estimated amount representing income taxes that the injured party may be required to pay on future income. In awarding damages to Elliott for impaired earning capacity, the court did not err in failing to take income tax consequences into consideration.

■ The rule we adopt has no application, however, as to the court's award of past wages in the amount of over $10,000.00. The reason for the rule—inability to predict with sufficient certainty what taxes would have to be paid—does not exist here, because taxes on income earned prior to trial can be easily calculated based on income tax laws and regulations as they existed at the time the wages would have been earned. The court erred in failing to deduct from the award for past loss of wages the income taxes Elliott would have had to pay had he earned the amount awarded prior to the trial.

5. *Past Loss of Wages.*

Elliott testified that he had not lost any military pay or allowances between the date of the accident in April 1963 and the date of his military discharge in January 1966. During that period of time Elliott was either hospitalized or on leave, except for the period January to August, 1964, when he was on duty status. The trial court awarded $10,752.85 for a partial past wage loss covering the period from the date of the accident to the day of Elliott's discharge from the Air Force, but excepting the period between January and August, 1964, when Elliott was on duty status.

Beaulieu contends that this award for past wages was error. His argument in essence is that the general principle underlying the assessment of damages in tort cases is that the injured person is entitled to be replaced as nearly as possible in the position he would have occupied had it not been for the defendant's tort, and that since Elliott suffered no loss of wages during the period involved he should be awarded none.

■ In arguing that the award should be sustained, Elliott urges the adoption of the collateral source rule, which provides that damages may not be diminished or mitigated on account of payments received by plaintiff from a source other than the defendant.[19] We applied this rule as to workmen's compensation benefits in Ridgeway v. North Star Terminal & Stevedoring Co.[20] We apply the rule in this instance. By entering the military service, Elliott in effect agreed to perform certain duties and func-

---

17. Annot., 63 A.L.R.2d 1393, 1396 (1959).

18. Oddo v. Cardi, 218 A.2d 373, 377 (R.I. 1966). See also Dixie Feed & Seed Co. v. Byrd, 52 Tenn.App. 619, 376 S.W.2d 745, 749 (1963); appeal dismissed, 379 U.S. 15, 85 S.Ct. 147, 13 L.Ed.2d 84 (1964); Cunningham v. Rederiet Vindeggen, 333 F.2d 308, 313–315 (2d Cir. 1964); Spencer v. Martin K. Eby Const.

Co., 186 Kan. 345, 350 P.2d 18, 22–25 (1960); Kawamoto v. Yasutake, 49 Haw. 42, 410 P.2d 976, 981 (1966).

19. Bell v. Primeau, 104 N.H. 227, 183 A. 2d 729, 730, 7 A.L.R.3d 512, 514 (1962). The collateral source rule is followed in most jurisdictions. Annot., 7 A.L.R.3d 516, 520 (1966).

20. 378 P.2d 647, 650 (Alaska 1963).

tions. in exchange for certain benefits to be given, him by the government. One of those benefits, was that he was to receive military pay and allowances during periods of physical incapacity from performing his duties. This was in the nature of a contractual arrangement between Elliott and the government when he became a member of the armed forces, and which he may have paid for by accepting wages lower than those he might have obtained from the performance of like duties in civilian life. The income that Elliott received from the government is not the result of earnings, but of such previous contractual arrangement.[21] Such a contractual arrangement was made for Elliott's own benefit, and not for the benefit of a tort feasor, such as Beaulieu. The latter has no right to claim the benefit of such an arrangement by having the damages awarded against him reduced by the amount that Elliott was paid by the government during the period of his disability. The trial court did not err in awarding damages for loss of wages during the period of Elliott's disability while he was still in the military service.

### 6. *Future Pain and Suffering.*

The court awarded Elliott $71,244.00 for pain and suffering that he would experience for the remainder of his life. Beaulieu contends that the evidence does not justify such an award.

An infection, osteomyelitis, had developed in the bone of Elliott's injured ankle. Elliott testified that from the time of the onset of the osteomyelitis he was required to keep his ankle in an upright position for a period of from four to five days on an average of once a month to alleviate the pain he experienced, that he suffered pain of a sufficient intensity to keep him awake the better part of the night on an average of one night per week, and that there was an open, draining sinus on his ankle. Beaulieu concedes that Elliott's testimony was sufficient to justify an award for past pain

and suffering.[22] However, Beaulieu contends that there is a lack of substantial medical evidence to justify an award for pain and suffering in the future.

Dr. Wichman testified that the osteomyelitis would cause the sinus tract in Elliott's ankle to become obliterated or plugged by bone particles in the drainage fluid—osteomyelitis being the type of infection caused by the healing process in draining away or discarding dead bone—and that this caused a pressure build-up and a swelling with resulting pain.

Dr. Foster testified that the probable source of Elliott's pain was the presence of injured tissues which, throughout the injury, operation and infection, became so altered that with use they became sore. It is true, as Beaulieu points out, that Dr. Foster said that within approximately five years from the time of trial, Elliott would be able to return to work and would no longer be limited by the infection. But the doctor also testified that at the end of the five-year period Elliott would still have some pain, and that it was a reasonable medical probability that the osteomyelitis would remain with Elliott the rest of his life.

Dr. Scholtens gave his opinion as to the reasonable medical probability of the infection in Elliott's ankle continuing for the remainder of his life. He said:

> Yes, I have an opinion, and my opinion is that the infection present, by all odds, will continue, there's an excellent possibility for the rest of his life, no matter what medical attempts are made to clear the infection in the ankle. Present—the experience with osteomyelitis indicates that it's very, very difficult to treat, that cures are relatively infrequent. Recurrences of those that appear to be cured are frequent. For those reasons, I would feel that he, at present, has a chronic infection. He has the fuel for the infection, dead bone, and I think that this

---

21. Restatement, Torts § 920 comment e (1939).

22. The trial judge awarded Elliott $7,500 for past pain and suffering.

will continue in the future for as far as I can see.

And as to the reasonable medical probability of the general condition of the ankle improving or remaining the same, Dr. Scholtens said:

I'd say that the chances are that his ankle will stay very much the same as it is, with no appreciable change. This is by far the greatest probability. * * * There's—there's a slight chance that it could get worse. There's a slight chance that it could get better, but—and I'm not talking in terms that if he never sees a doctor again. I mean if he's treated, I think the chances of this appreciably improving are slim or really of getting a great deal worse, that's what I'm saying.

■ The trial court found that it was a reasonable medical probability that Elliott's condition, including the infection in the ankle and the pain, would continue for the remainder of his life. The medical evidence supports such a finding; we cannot say that it is clearly erroneous. Such a finding, in turn, justifies the court's conclusion that Elliott should be awarded damages for pain and suffering for the remainder of his life. An award of such damages was not error.

The trial court used a per diem formula in assessing damages for future pain and suffering. In its Conclusion of Law No. 5 the court said:

That plaintiff is entitled to recover from defendant the sum of $78,636.00 for past and future pain and suffering, for his general physical disability and permanent crippling and for the fact that he will no longer be able to lead that sort of life to which he had become accustomed. The past pain and suffering is set at the sum of $7,500.00. The future pain and suffering of $71,244.00 is based upon a finding of $20.00 per day for 52 days per year and an additional $3.00 per day for 313 days per year for a total sum of $1,979.00 per year multiplied by 36 years.

Beaulieu contends that such a method of ascertaining damages constituted prejudicial error.

A similar contention was made by a defendant in Imperial Oil, Ltd. v. Drlik, 234 F.2d 4 (6th Cir. 1956), cert. denied, 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236 (1956), where the trial court had used a per diem formula in awarding damages for pain and suffering. It was argued there that damages for pain and suffering cannot be properly computed by using a mathematical formula. In answer to this argument, the Court of Appeals said:

It remains to be considered whether the method used by the District Judge in determining the total amount was error as a matter of law. It may be that it was a novel one but. it does not follow that it invalidates the award. In determining the amount of an award for pain and suffering a juror or judge should necessarily be guided by some reasonable and practical considerations. It should not be a blind guess or the pulling of a figure out of the air. At the same time there is no exact or precise measuring stick. Exact compensation is impossible in the abstract but the juror or judge should endeavor to make a reasonable or sane estimate. The practical considerations influencing a particular juror or judge or the reasoning used by him may very well differ with the method used by another juror or judge, yet each of such different methods or modes of reasoning may be a reasonable method of reaching the desired result. We are more concerned with the result, reached by a reasonable process of reasoning and consistent with the evidence, than we are with which one of several suitable formulas was actually used by the juror or judge. It is not necessary for us to adopt the method used by the District Judge as a rule of law for the proper disposition of such an issue, and we do not do so. In our opinion, it was not an arbitrary or unreasonable approach to the problem presented and its application was so adjusted in the present case as to be consistent

with the evidence and to reach a result which does not appear to us to be manifestly unjust. United States v. Puscedu, 5 Cir., 224 F.2d 5; City of Knoxville, Tenn. v. Bailey, 6 Cir., 222 F.2d 520, 531.[23]

We agree with the foregoing. As we stated in Patrick v. Sedwick,[24] there is no fixed measure of compensation in awarding damages for pain and suffering, and such an award necessarily rests in the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation. We can see nothing manifestly unfair or unjust about the method used by the trial court in assessing damages for future pain and suffering. In fact, as was suggested in the dissenting opinion in the Kansas case of Caylor v. Atchison, Topeka & Santa Fe Ry. Co.,[25] it appears to be a fair argument and a rational approach to treat damages for pain the way it is endured—day by day, month by month, year by year. Ultimately, however, the question for decision is whether the total sum is reasonable or not, regardless of how it was arrived at. We find no error in the method used by the trial court in awarding damages for future pain and suffering.

Beaulieu contends that the total sum awarded is unreasonable and is grossly excessive. We shall not set aside an award on a claim of excessiveness unless it is so large as to strike us that it is manifestly unjust, such as being the result of passion or prejudice or a disregard of the evidence or rules of law.[26] Considering the evidence of permanent damage to Elliott's ankle, the osteomyelitis, and the pain and suffer-

ing that he is likely to endure for the remainder of his life, it is our opinion that the award for future pain and suffering was not manifestly unjust.[27] And Beaulieu did not contend in his brief or in oral argument that the trial court acted through passion or prejudice.

Beaulieu contends that the court erred in not reducing the future pain and suffering award to present value. He relies principally on the case of Affett v. Milwaukee & Suburban Transp. Corp.,[28] where the court, after disapproving of the use of a mathematical formula for computing damages for pain and suffering, said: Logically, if this method were followed, the gross amount arrived at should be discounted to its present worth." [29]

If an award for future pain and suffering must be reduced to present value when a mathematical formula is used, it must be for the same reason that an award for future earnings is discounted under the prevailing rule—i. e., because the plaintiff receives his damages for the future long in advance and is able to invest the sum awarded and realize earnings during the intervening period. But we have held that as to impairment of future earning capacity, the award should not be reduced to present value. The same reasoning applies here as to an award for future pain and suffering. Because of the annual rate of inflation offsetting dividends or interest that may be expected on "safe" investments, and of the risk of loss involved in making other investments, a plaintiff is more likely to be restored to his original condition had defendant not committed his tort by allowing the plaintiff his award for future pain and

23. 234 F.2d at 11. See Annot., Per Diem or similar mathematical basis for fixing damages for pain and suffering, 60 A. R.L.2d 1347 (1958).

24. 413 P.2d 169, 176 n. 21 (Alaska 1966).

25. 190 Kan. 261, 374 P.2d 53, 64 (1962).

26. Imperial Oil, Ltd. v. Drlik, 234 F.2d 4, 11 (6th Cir. 1956), cert. denied, 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236 (1956).

27. Accord, Peters v. Benson, 425 P.2d 149, 152 (Alaska 1967); National Bank of Alaska v. McHugh, 416 P.2d 239, 244 (Alaska 1966); Patrick v. Sedwick, 413 P.2d 169, 175 (Alaska 1966).

28. 11 Wis.2d 604, 106 N.W.2d 274, 279, 86 A.L.R.2d 227, 236 (1960).

29. See also Rigley v. Prior, 290 Mo. 10, 233 S.W. 828, 832 (1921); Comment, 60 Mich.L.Rev. 612, 629–30 (1962).

suffering without reduction to present worth.

Finally, Beaulieu contends that the greater part of Elliott's pain and suffering was attributable to his failure to follow his doctor's orders in not bearing as much weight as possible on his ankle, and therefore that such pain and suffering cannot be the basis for the recovery of damages.

Dr. Wichman did state that if he were asked by Elliott for treatment, he would suggest as much ambulation as possible, and that it was his opinion that complete ambulation would be his suggestion or prescription. However, there is no evidence that Dr. Wichman ever told Elliott to bear as much weight as possible on his ankle. All that Wichman said was that this is what he would prescribe if he were to treat Elliot for his injury.

■ There is also no testimony by Dr. Foster that he told Elliott to bear as much weight as possible on his ankle. The doctor stated that he prescribed crutches and advised Elliott to use them to tolerance by testing how much weight he would be able to put on his foot, absorbing the rest with the crutches. When Dr. Foster was asked what his suggested course of procedure would be, based on his examination of Elliott's ankle, he stated:

> My suggested course of procedure is for Sergeant Elliott to continue bearing what—weight he can on his foot, to treat it when it becomes inflamed and sore and red by warm soaks and elevation, to continue on the use of the crutches up to the limits of comfort, to maintain his brace on his ankle as he is.

There is nothing in the evidence to show that Elliott had not done what Dr. Foster suggested that he do. The record does not substantiate Beaulieu's claim that Elliott's pain and suffering was attributable to his failure to follow the orders of his doctor.

### Elliott's Appeal

As a basis for computing Elliott's impairment of future earnings for the remainder of his work life of 29 years, the court used Elliott's wage scale in the Air Force at the time of his discharge in the amount of $462.30 a month. On his appeal, Elliott claims that his future wage loss was greater than that determined by the court. The basis for his claim is that, considering evidence of his experience in truck driving and traffic management, the court ought to have determined what earnings Elliott probably would and could have received in civilian life—the wage scale there being higher for the same type of work than in the military service.

■ We have held that this case must be remanded to the trial court for the purpose of making detailed and explicit findings as to Elliott's earning capacity and the degree of impairment in respect thereto. Such findings may contain the answer to the question as to why the court used Elliott's military pay, rather than civilian pay scales for equivalent work, as a basis for computing future wage loss for the entire period of 29 years, when Elliott had indicated that he may have retired from the Air Force at the end of 20 years of service which would have been approximately two years after his discharge if he had not received a medical discharge. In the absence of adequate findings and a clear understanding of the basis for the court's award, we are unable to pass upon Elliott's contention that the award for impairment of future earning capacity was inadequate.

■ Similarly, we are unable to pass upon Elliott's contention that the evidence established that the impairment of his earning capacity was total, or near total, rather than 50% as determined by the court. Adequate findings as to Elliott's degree of impairment of earning capacity may afford a clear understanding of the basis for the court's determination. The findings are not sufficient for that purpose now.

Elliott's next point has to do with attorney's fees allowed by the court. Civil Rule 82(a) (1) provides as follows:

> Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered

to in fixing such fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:

## ATTORNEY'S FEES IN AVERAGE CASES

|  |  | Contested | Without Trial | Non-Contested |
|---|---|---|---|---|
| First | $2,000 | 25% | 20% | 15% |
| Next | $3,000 | 20% | 15% | 12.5% |
| Next | $5,000 | 15% | 12.5% | 10% |
| Over | $10,000 | 10% | 7.5% | 5% |

Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.

The court awarded Elliott $13,870.29 attorney's fees based on the percentages listed in the "without trial" category of the above rule. Elliott claims that this was an erroneous application of the rule, and that a correct computation of attorney's fees should have been under the "contested" category [30] because even though liability was admitted, the question of damages was in issue and was contested in a four-day trial.

In a case like this where liability is admitted but the amount of damages is contested, the question of which category of Civil Rule 82(a) (1) is applicable in computing attorney's fees is a matter within the discretion of the trial court. We limit our review in matters of this type to the question of whether the court exceeded the bounds of such discretion—whether such discretionary authority has been abused.[31]

The court's reasons for assessing attorney's fees as it did was that liability was admitted, that the total recovery of damages was large, and that the attorney's fees allowed were adequate. Considering the character of this litigation and the amount of recovery,[32] we cannot say that the court's reasoning was not sound and that the manner of applying the rule amounted to an abuse of discretion.[33]

Costs were assessed against Beaulieu in the amount of $82.40. Elliott claims that it was error to not include in the costs certain expenses incident to the taking of depositions necessary to establish liability.[34]

The taxing of costs rests largely in the sound discretion of the trial court, and we shall not interfere with the exercise of that discretion except in cases of abuse.[35] Elliott claims that the depositions taken were necessary to establish liability. But he does not point out what depositions were involved, how they related to liability, when they were taken, or when the concession of liability was made by Beaulieu.

30. Attorney's fees computed under the "Contested" category of the rule would have amounted to $17,843.73.

31. McDonough v. Lee, 420 P.2d 459, 465 (Alaska 1966); Kenai Power Corp. v. Strandberg, 415 P.2d 659, 661 (Alaska 1966); Patrick v. Sedwick, 413 P.2d 169, 178–179 (Alaska 1966); Preferred Gen. Agency v. Raffetto, 391 P.2d 951, 954 (Alaska 1964); Davidsen v. Kirkland, 362 P.2d 1068, 1070–1071 (Alaska 1961).

32. Elliott's total recovery, in addition to costs and attorney's fees, was $169,937.-25.

33. McDonough v. Lee, 420 P.2d 459, 465 (Alaska 1966).

34. Civ.R. 79(b) provides that "A party entitled to costs may be allowed * * * the necessary expenses of taking depositions for use at trial * * *."

35. Euler v. Waller, 295 F.2d 765, 766, 97 A.L.R.2d 135, 137–138 (10th Cir. 1961).

In these circumstances we cannot find any abuse of discretion in the court's refusal to allow as costs the expenses incident to the taking of such depositions.

The judgment is set aside. The case is remanded to the superior court for the purpose of making appropriate findings as to the damage issues referred to in this opinion and for the further purpose of entering an appropriate judgment thereon.