**George Raymond DASH and Delores Viola Dash, Appellants,**

**v.**

**STATE of Alaska, Appellee.**

**No. 1405.**

Supreme Court of Alaska.

Dec. 17, 1971.

Richard F. Lytle, of Houston & Lytle, Anchorage, for appellants.

John E. Havelock, Atty. Gen., Juneau, Richard P. Kerns, Asst. Atty. Gen., Anchorage, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

ERWIN, Justice.

This appeal arose out of an action in eminent domain brought by the State of Alaska on April 16, 1968, to condemn property owned by appellants, Mr. and Mrs. Dash, near Anchorage. The land was condemned in order for the State Highway Department to extend C Street south to International Airport Road as part of the state's secondary highway system. The property in question is a parcel containing 38.46 acres located on the north side of International Airport Road at C Street extended. The right-of-way condemned is a strip running north-south containing about 5.841 acres, which bisects the Dash property. The property was zoned "unclassified" and except for a small house was unimproved. A good deal of commercial and industrial development was taking place in the neighborhood.

At trial both parties presented expert testimony on the just compensation for the property taken. Using the "market data" approach (sales of similar property), appellants' witnesses testified respectively that just compensation would amount to $115,700 ($76,068 for the portion taken, plus damages to the remainder) and $129,104 ($76,184 for the portion taken, plus damages to the remainder). In addition, appellants introduced evidence of sales of a neighbor's property which was made subject to an approved subdivision plan being filed. Appellants argue that these sales fix the fair market value of the land taken at $72,611.

The state presented expert testimony by a civil engineer on the cost of a proposed industrial subdivision plan alleged to be the highest and best use of the land. A real estate appraiser called by the state gave his opinion as to the just compensation based on both the "market data" and "anticipated use" or "development" methods of appraisal. This latter witness testified using the market data approach that the difference in market value of the entire parcel before and after the taking was $21,000, that

there were benefits but no damages to the remainder, and that the market value of the part taken was $39,692. This same witness, using the anticipated use or development method, and relying on the discounted proceeds expected from future sales, testified over an objection based on the "speculative nature" of the evidence that the difference in market value of the full parcel before and after the taking was $12,000, and that there were benefits but no damages to the remainder. He indicated that the value of the part taken was $29,769. Giving greater weight to the market data approach, the witness arrived at a final estimate of just compensation of $40,000.

The jury was apparently impressed with the expert's testimony, arriving as it did at a verdict of $40,000. The verdict was a lump-sum verdict, however, and it is therefore impossible to discover whether the jury agreed with the state's expert that there was no injury to the remainder of the land. Appellants moved for judgment notwithstanding the verdict and for a new trial. Both motions were denied by the trial court. This appeal followed.

Appellants raise, in one fashion or another, four basic claims: (1) The admission into evidence of expert testimony by the state's witnesses regarding the cost of developing an industrial subdivision alleged by the state to be the "highest and best use" of the condemned land, and relative to the "capitalization" of future proceeds to be derived from the sales of the subdivided land was error. (2) The admission of evidence of a sale of property that took place 15 months after the taking of appellant's property on the issue of market value was error. (3) Instruction No. 14A which placed the burden of proof as to fair market value on the defendant landowner was improper. (4) The denial of appellants' motion for judgment notwithstanding the verdict based on evidence of a sale of neighboring land of similar acreage at almost double the amount of the verdict, and the denial of the motion for a new trial were an abuse of discretion.

1. Admission of Expert Testimony on Market Value Based on the Development Costs and Income Capitalization of a Potential Subdivision.

 Although there is substantial case authority either entirely excluding evidence of a possible subdivision of condemned land or disallowing consideration of the capitalization of future profits on the issue of market value, we think the sounder view favors admission for several reasons: (1) Such evidence is highly relevant on the issue of market value; (2) it is accepted practice among professional real estate appraisers to consider the above as indicators of market value; and (3) it is undesirable for this court to severely restrict the role of the expert witness in eminent domain cases by delineating strict testimonial boundaries.

Real estate appraisers usually approach land valuation problems by utilizing three approaches to "value" either singly or in combination. They are the cost approach, the market data approach, and the income approach.[1] The cost approach, which arrives at value by determining the current cost of reproducing a property less depreciation, is used only when the property is improved. The market data approach measures value by comparison to recent sales of similar property. The income approach, which is concerned with the present worth of future benefits from the property, arrives at present value by discounting or "capitalizing" the future income which could be derived from the property. The income capitalization method involves three steps:[2]

(1) an estimate of the income which the property is capable of producing, including both periodic income and the income to be derived from future sale of the property; (2) an estimate of the rate of return (capitalization rate) an investor would require in order to induce him to make an investment with the risk and lack of liquidity of an equity interest in the particular property; (3) an application of this capitalization rate to the estimated income to derive the present value of the estimated income. (Footnotes omitted)

The estimate of the state's expert in this case was based on the discount of proceeds from future sales, an approach usually referred to as the "anticipated use" or "development" method of appraisal.[3] Although technically the anticipated use method may be regarded as distinct from income capitalization since sale proceeds are "discounted" rather than "capitalized", the two approaches are closely related; both methods involve a reduction of anticipated future receipts to their present worth. We note that several legal authorities have used the term "income capitalization" to include the discounting of sale proceeds,[4] and we will use the term in this broader sense in this opinion.[5]

Briefly, the nature of the testimony objected to was as follows: Mr. Chapman, a civil engineer and expert in land development, testified in detail as to the layout

---

1. American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 60–67 (5th ed. 1967); 7 Nichols, Eminent Domain § 4.08(4) at 4–31 to 4–35 (Rohan & Ruskin ed., 3d ed. 1971).

2. Comment, Valuation of Real Property—Role of the Expert Witness, 44 Wash.L. Rev. 687, 698 (1969) (paraphrasing a number of appraisal texts). See also Schmutz, Condemnation Appraisal Handbook 42–47 (1963).

3. Appraisal of Real Estate, n. 1, supra, at 119, 126–28.

4. See Comment, 44 Wash.L.Rev. 687, 698, quoted in text at note 2, supra; 5 Nichols, Eminent Domain § 18.11 [a] at 18–54 through 18–57 (Sackman ed. 3d ed. 1969), quoted in text at note 8, infra.

5. As will appear below, the sale proceeds were anticipated by the expert to come in over a five-year period; consequently these proceeds might well be regarded as a flow of periodic income. Thus, the expert used the phrase, "the resulting cash flow or net income from sales is capitalized into value . . .", in his report to describe his "anticipated use" approach.

and development costs of industrial subdivisions on the Dash property before and after the taking. Mr. Potts, an eminently qualified expert in real estate appraisal, then testified as to the value of the property using the market data and anticipated use approaches. As noted above, using the market data approach he found the difference in the before and after market value of the whole parcel to be $21,000, and the value of the part actually taken to be $39,629; the anticipated use approach, on the other hand, yielded figures of $12,000 and $29,769, respectively. He found nondeductible benefits but no severance damages to the remainder under both approaches.[6]

Mr. Potts' anticipated use methodology was as follows: Based on his analysis of the Anchorage real estate market and the neighborhood, he determined that it would take approximately five years for the Anchorage market to absorb all the lots when subdivided into their most marketable size. He then estimated the market value of each of the individual lots from appropriately adjusted market data, and determined the order in which they would probably sell over the five-year period. Next, using cost data supplied by Mr. Chapman, he subtracted development costs for each of the five years to arrive at the net income for each year. The total net income was then "capitalized" into its present value by estimating the rate of return anticipated by Anchorage-area investors. Mr. Potts determined that real estate investors in the area expect a minimum return of 20% per year so that over a five-year interval an investor would double his investment.

Since the lots would take an estimated five years to be sold, an investor would pay only one-half the anticipated net income; the net income was therefore "capitalized" into present market value by dividing it in half. This was done in both the "before" and "after" situations.

Appellant argues that this evidence was "speculative", that it was prejudicial since it "presented a picture to the jury that the land taken had done [sic] no damage to the remainder and that appellants had only suffered a loss of $12,000", that legal authority forbids consideration of estimates based on the profits of a speculative enterprise, and that it was improper to discount anticipated profits to their present value.[7]

Although it is standard economic theory that the present value of any asset may be measured by capitalizing the net income which it can be expected to yield through its most profitable use,[8] the courts have displayed considerable reluctance to admit this type of evidence. Nichols, for example, states:[9]

> A valuation based upon an estimate of the potential income which might be realized from a utilization by the owner of the property in a manner of which it is capable, but of which he has not yet availed himself, has been generally rejected on the ground that such income is too uncertain and conjectural to be acceptable. (Citing cases)

The following passage, again from Nichols, is illustrative of the attitude of many courts:[10]

> [Although the owner may introduce evidence of the highest and best use of the

6. The rule in Alaska is that special benefits to the remainder can only be used to offset severance damages to the remainder. In the event that special benefits exceed severance damages, the landowner is still entitled to receive the full market value of the portion actually taken. AS 09.55.310.

7. Although this case has an unusual twist in that it is the condemning authority rather than the landowner who is seeking to introduce evidence of income cap-

italization, the basic issue and arguments involved remain the same in either situation.

8. *See* 1 Orgel, Valuation Under Eminent Domain § 155 (2nd ed. 1953).

9. 4 Nichols, Eminent Domain § 12.512 [2] at 112 (Sackman ed., 3d ed. 1962). *See also id.* at § 12.3121 [3], 122–26.

10. 5 Nichols, Eminent Domain § 18.11 [2] at 18–54 through 18–57 (Sackman ed., 3d ed. 1969).

land he] cannot, however, go further and describe in detail to the jury a speculative enterprise for which in his opinion (or that of some expert) the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise. In other words, he cannot capitalize the projected earnings of a nonexistent enterprise or projected use. The owner cannot, for example, introduce evidence of the return that he would derive from cutting up a vacant tract of land into building lots, since this would involve pure conjecture as to how fast the lots would be sold, and the price that each would bring. . . . The trial court cannot be too careful in excluding evidence of this character, as witnesses can always be found who will, in their imagination, cover the most hopelessly unmarketable vacant land in the neighborhood with apartment houses. . . . (footnotes omitted)

It is widely accepted, however, that in determining just compensation, usually measured by the "market value" of the property,[11] the highest and most profitable use for which the land is adaptable may be considered to the extent that the prospective demand for such use affects the property's present market value.[12] Thus, many courts, including Alaska's,[13] have allowed evidence of a reasonably probable subdivision to be admitted to prove the *adaptability* of the land for subdivision use.[14] Several cases have also held it is proper for condemning authorities to introduce such evidence in order to reduce damages by showing the increased adaptability for subdivision purposes.[15]

Many cases, however, have held that evidence of a subdivision, even if admissible to prove the *adaptability* of the land for subdivision purposes, is not admissible to show the value of *individual lots* on the ground that this would give the jury a false sense of value and lead to excessive damages.[16]

A truly speculative or imagined use should not be considered,[17] however, and the courts are much more liberal in admitting evidence of a potential subdivision when some preliminary steps have been taken to develop the land.[18] Still, a number of cases take the extreme position that even when no steps have been taken to develop a subdivision, evidence of the number and value of the individual lots may be shown.[19]

11. This court in State v. 7.026 Acres, 466 P.2d 364 (Alaska 1970), determined that fair market value was an appropriate measure of the just compensation guaranteed by Alaska Const. Art. I, § 18.

12. *Id.* at 366; Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L. Ed. 1236 at 1244 (1934); 26 A.L.R.3d 780–847 (1969).

13. State v. 7.026 Acres, 466 P.2d 364, 367 (Alaska 1970), (citing Iske v. Metropolitan Utilities District of Omaha, 183 Neb. 34, 157 N.W.2d 887 at 892 (Neb. 1968)). In that case the introduction of a plat of a proposed subdivision by the landowner was held proper.

14. People ex rel. Dept. of Public Works v. Silveira, 236 Cal.App.2d 604, 46 Cal. Rptr. 260, 276–277 (1965); Flynn v. Commonwealth, Dept. of Highways, 428 S.W.2d 24, 26 (Ky.1968); 26 A.L.R.3d 780, 780–792 (collecting cases).

15. State By and Throughout State Highway Commission v. Bailey, 212 Or. 261, 319 P.2d 906 (1957); Aycock v. Houston Lighting & Power Co., 175 S.W.2d 710, 715 (Tex.Civ.App.1943).

16. *See, e. g.,* Northern Indiana Public Service Co. v. McCoy, 239 Ind. 301, 157 N.E.2d 181 (Ind.1959).

17. It has been held error, for example, to allow testimony that "it might be possible that it would be a subdivision out there." Georgia Power Co. v. Livingston, 103 Ga.App. 512, 119 S.E.2d 802 (Ga. App.1961).

18. See cases collected in Annot., 26 A.L.R. 3d 780 at 811–827 (1969).

19. United States v. Waterhouse, 132 F. 2d 699 (9th Cir. 1943), aff'd without opinion by an equally divided court, 321 U.S. 743, 64 S.Ct. 484, 88 L.Ed. 1047 (1943); State Highway Dept. v. Wells, 102 Ga.App. 152, 115 S.E.2d 585, 586–

Thus, in summary, while there is a considerable split of authority, the majority of courts allow evidence of a potential subdivision only for the limited purpose of showing the adaptability of the land for subdivision purposes. One court, however, has concluded that much of the authority against the admission of best use income capitalization evidence can be distinguished on the ground that in those cases the only showing was that the property *could* have been so subdivided, not that such development was reasonably probable.[20]

The state places considerable reliance on the case of Iske v. Metropolitan Utilities District of Omaha, 157 N.W.2d 887 (Neb. 1968), which held that an expert's testimony which capitalized the anticipated rentals from a proposed recreational subdivision to arrive at an estimate of fair market value was properly admitted. We cited this case with approval in State v. 7.026 Acres, 466 P.2d 364 (1970), as authority for admitting a proposed subdivision plat.[21] The holding in *Iske* is not in any way restrictive because the plan the expert introduced required that a large amount of gravel be removed and a lake created before the recreational lots could be platted.

We find *Iske* persuasive. Since there was testimony below that the highest and best use of the property was as an industrial subdivision, and evidence that other property in the immediate area was subdivided for industrial purposes, the proposed subdivision was not purely conjectural or speculative. If the land were adaptable for subdivision purposes, it would seem that the potential income to be derived from sales of the subdivided lots would be highly relevant to a determination of the "market value", especially to the extent that sophisticated investors who make decisions on the basis of income capitalization take part in market transactions.[22] Moreover, the estimates of sale prices for individual lots were properly discounted to show present value as affected by their development potential.

Finally, two important factors tended to increase the reliability of the "best use" evidence as introduced at the trial below. First, the evidence concerned proceeds from a future sale of the land itself, and not the impact the income from a non-related business venture conducted on the land might have on the market value—the latter necessarily being much more speculative in nature. Second, the evidence was not presented to the jury for its uninstructed consideration, but was part of an expert's appraisal prepared pursuant to accepted appraisal practices and carefully explained to the jury.

We note that capitalization of income, in contexts other than proposed subdivisions, has been recognized as an accepted method of valuation by a number of jurisdictions.[23] Although capitalization of anticipated proceeds from a proposed subdivision necessarily has a speculative element, it still has a direct impact on the property's market value since it will influence investment decisions and thereby affect supply and demand.

 Further, to the extent that the "just compensation" guarantee in article I, section 18, of the Alaska Constitution com-

587 (1960); State Through Dept. of Highways v. Riley, 143 So.2d 396, 398 (La.App.1962); Tulsa v. Biles, 360 P. 2d 723 (Okla.1961).

20. Iske v. Metropolitan Utilities Dist. of Omaha, 157 N.W.2d 887 (Neb.1968).

21. *Id.* at 900–901.

22. *See* Hodges, Income Capitalization for Investor Clients, 36 Appraisal J. 175 (1968), *cited in* Comment, Valuation of Real Property—Role of the Expert Witness, 44 Wash.L.Rev. 687, 699 (1969).

23. Burritt Mut. Savings Bank of New Britain v. City of New Britain, 20 Conn. Sup. 476, 140 A.2d 324, 326 (1958) (tax appraisal case containing detailed description of income capitalization method); Golden Gate Corp. v. Providence Redevelopment Agency, 260 A.2d 152, 154 (R.I.1969); State v. Heltborg, 140 Mont. 196, 369 P.2d 521, 523 (1962); Salt Lake County v. Kazura, 22 Utah 2d 313, 452 P.2d 869, 870–871 (Utah 1969).

prises a notion of *fair market value* rather than merely the price the property will bring in an imperfect market, income capitalization must be considered particularly apposite. One authority expressed the difference between value and price as follows:[24]

> The essential difference between market price and market value . . . lies in the premises of intelligence, knowledge and willingness, all of which are contemplated in market value but not in market price. Stated differently, at any given moment of time, market value connotes what a property is actually worth and market price what it may be sold for.

Thus, even in a market where a parcel's price is unaffected by its income potential, income capitalization must be considered to have a bearing on "market value".[25] The danger that market price will not closely reflect market value is enhanced when the property is not currently generating income.

It is significant that the method of valuation used by Potts has been recognized by the American Institute of Real Estate Appraisers. Indeed, income capitalization in general and the anticipated use or development method in particular are standard appraisal practices.[26] It would be unwise for us to require exclusion of such a widely-recognized method of valuation through unduly rigid evidentiary rules.

This leads us to a further consideration: the role of the expert witness in eminent domain proceedings.[27] The passages quoted earlier from Nichols are illustrative of a judicial attitude which led one commentator to remark:[28]

> [T]he thrust of the rules of evidence has been towards exclusion, with the result that most of the economic factors normally considered in valuation by both experts and nonexperts, is [sic] not admissible evidence. This is unfortunate, for though the field is indeed a complicated one, the exclusion of relevant facts does not enable the trier of fact to reach a just or sensible result.

The Pennsylvania Legislature, reacting against this exclusionary tendency, enacted the 1964 Eminent Domain Code which significantly modified the evidentiary rules in eminent domain proceedings:[29]

> (1) A qualified valuation expert may, on direct or cross-examination, state any or all facts and data which he considered in arriving at his opinion, whether or not he has personal knowledge thereof, and his statement of such facts and data and the sources of his information shall be subject to impeachment and rebuttal.
>
> (2) A qualified valuation expert may testify on direct or cross-examination in detail as to the valuation of the property on a comparable market value, reproduction cost or *capitalization basis.* . . . (Emphasis added)

As stated by the Joint State Government Commission's 1964 Report, the main pur-

---

24. American Institute of Real Estate Appraisers, Appraisal Terminology & Handbook, 131 (5th ed. 1967).

25. In State v. 7.026 Acres, 466 P.2d 364 (Alaska 1970), this Court said "[o]ne criterion for determining value is what the property is worth on the market— its fair market value, and this is to be determined by a just consideration of all the uses for which the property is suitable." Other courts have recognized that just compensation may involve more than mere market price, however. *See* Comment, Valuation of Real Property—Role of the Expert Witness, 44 Wash.L.Rev. 687, 689–90 (1969).

26. *See* American Institute of Real Estate Appraisers, Appraiser of Real Estate 60–67, 119, 126–28 (5th ed. 1967). Extensive sections of this work are quoted verbatim in the state's brief at 24–26 and we will not elaborate further.

27. *See generally* Comment, Valuation of Real Property—Role of the Expert Witness, 44 Wash.L.Rev. 687 (1969).

28. Snitzer, Valuation Evidence in Pennsylvania Eminent Domain Cases, 35 Temple L.Q. 386, 400 (1962).

29. Pa.Stat.Annot. Title 26, § 1–705 (Purdon Supp. 1969), *quoted in* 44 Wash. L.Rev. 686, 700.

pose of the Pennsylvania legislation was to:[30]

[C]hange and broaden existing law which unduly limits the examination and cross-examination of an expert witness, so as to permit the expert witness to testify on direct as well as cross-examination, to any and all matters which he considered (not necessarily 'relied on') in arriving at his opinion of damages. Under existing law . . . the expert is unduly limited as to what he may testify to, and as a consequence, he cannot show his competence or what perhaps is more important, his lack of competence.

■■■■ We feel that the Pennsylvania statute evidences a much sounder view of the expert's role in eminent domain proceedings than does the "majority rule" as articulated by Nichols. A comment in the Washington Law Review describes the appraisal profession as dynamic, developing and the chief contributor to value determinations made by courts.[31] The comment recommended that the courts permit expert witnesses to testify about all matters considered by them in arriving at their valuation opinions because:[32]

(1) The trier of fact must rely on the experts' analyses of the valuation problem in order to identify and analyze the data required to make a fully considered determination of market values;

(2) The court cannot assure the trier of fact that an expert valuation witness is competent and honest by use of restricted rules of qualification of experts or admissibility of testimony; and

(3) Thorough and knowledgeable examination and cross-examination would better provide the trier of fact with ade-

quate information to weigh the opinions of opposing experts.

Regarding the last factor, it is interesting to note that appellants' cross-examination of the state's witness Potts covered 76 pages of the transcript. As the Washington Law Review Comment points out, a liberal and flexible consideration of expert appraisal testimony will both encourage the development of expertise among the expert witnesses and make possible the full utilization of that expertise by the courts in determining just compensation.[33]

Finally, for this court to apply the restrictive rules judicially adopted elsewhere to limit expert testimony would invade the traditional province of the jury as trier of fact to weigh the credibility of the expert witness;[34] it would be inappropriate for this court to do so under the guise of a ruling on the admissibility of evidence of properly discovered anticipated proceeds from a proposed subdivision.

One other related matter was raised by appellants which deserves brief mention at this point. The appellants make the following argument:

The state's testimony by applying the interest rate to the development costs and management costs and then reducing them to what a purchaser would pay at the date the state took the property has in reality reduced the profits that a prospective purchaser could expect in five years to their present worth. The reduction to present worth has been rejected by the Alaska court in Beaulieu v. Elliott, 434 P.2d 665 [(1967)], [Leavitt v. Gillaspie, 443 P.2d 61 (1968)], in recognition of their continuing inflation.

Both *Beaulieu* and *Leavitt* involved a reduction to present worth of future earn-

30. Pa.Stat.Annot. Title 26, § 1–705, Comment, Joint State Government Commission, 1964 Report (Purdon Supp.1969), *quoted in* 44 Wash.L.Rev. 687, 701.

31. Comment, Valuation of Real Property—Role of the Expert Witness, 44 Wash.L.Rev. 687, 715 (1969). The profession has extensive basic literature, several well-established periodicals, and

seems to be moving toward a greater utilization of modern data processing techniques and computer systems. *Id.* at 699–700, n. 58.

32. *Id.* at 715.

33. *Id.*

34. *See* State v. Phillips, 470 P.2d 266, 272 (Alaska 1970).

ings in personal injury actions and are in no way relevant to the case before the court. Further, it is clear that a failure to discount future proceeds in eminent domain cases would lead to a grossly exaggerated valuation.[35]

2. Admission Into Evidence of a Sale Taking Place Fifteen Months After The Date of the Taking by the State.

Appellants argue that evidence of a sale of property which took place one year and three months after the date the Dash's property was condemned was improperly admitted because in effect the trial court is

holding that a reasonable person in April, 1968, would know and take into consideration what property was going to sell for in July, 1969. This would then give the theoretical reasonable man the power to see the future. . . . The allowance of such a rule will tend to prolong the time of trial, since one side or the other, depending on the real estate market, will be trying to forestall the trial to allow their position to be improved.

One authority states the rule to be that whether there is sufficient similarity between the property taken and the comparable sale property is generally left to the sound discretion of the trial judge. A sale within a year is usually admitted as a matter of course, and the courts generally make no distinction between sales occurring before and sales occurring after the taking.[36] In State Kobayashi v. Heirs of Kapahi, 48 Hawaii 101, 147, 395 P.2d 932, 939 (Hawaii 1964), the court said:

From the foregoing authorities emerge the following applicable principles: Where evidence of a comparable sale or lease is offered, the trial judge may, in his discretion, admit or exclude it consid-

ering such factors as time of the transaction, size, shape and character of the comparable land, and whether there has been any enhancement or depression in value. It makes no difference whether the transaction occurred before or after the date of condemnation so long as it is not too remote a period of time and the land is reasonably comparable, having been neither enhanced or decreased in value by the project or improvement occasioned in the taking. The weight to be given such evidence is for the jury. The trial judge's determination as to admissibility or nonadmissibility of such evidence will not be upset on appeal unless it is a clear abuse of discretion.[37] Within fairly broad limits any dissimilarities between the properties should go to the weight of the evidence rather than to its admissibility.[38]

■ Although the sale of Parcel 5A took place fifteen months after the date of the taking, it was located next to the condemned parcel, had similar topography, and also fronted on International Airport Road. Under these circumstances, the trial judge did not abuse his discretion in ruling that the sale was admissible as a comparable sale.

3. Instruction 14A Regarding Burden of Proof.

■ The court instructed the jury that: [T]he burden of proof in this case rests upon the defendants, the landowners, to prove the compensation and damages to which they may be entitled.

This instruction was not objected to by the appellants at trial. Although State v. 45,621 Sq. Feet of Land, 475 P.2d 553 (Alaska 1970), decided after the trial below, overturned the old burden of proof

35. *See* text accompanying note 2, *supra*; American Institute of Real Estate Appraisers, Appraisal of Real Estate, 126–28 (5th ed. 1967).

36. 1 Orgel, Valuation Under Eminent Domain, § 138–139 (2nd ed. 1953).

37. *See also* 5 Nichols, Eminent Domain, § 21.31 [2] at 21–70 to 21–81 (Sackman ed., 3d ed. 1969).

38. *See, e. g.,* Ramming Real Estate v. United States, 122 F.2d 892 at 895 (8th Cir. 1941).

rule,[39] appellants' failure to object precludes consideration of this matter on appeal.

4. Denial of Appellants' Motion for Judgment Notwithstanding the Verdict and for a New Trial.

Appellants argue on the basis of the sale of a neighbor's property that the fair market value of the land taken was $72,611, and that they are entitled to judgment notwithstanding the verdict in that amount. This contention is without merit. In Long v. Newby, 488 P.2d 719, 722 (Alaska 1971), this court reaffirmed the rule of Snipes v. March, 378 P.2d 827, 828–829 (Alaska 1963), that where the evidence is such that fair-minded men in the exercise of reasonable judgment could differ on the question of fact to be determined, then the matter should be submitted to the jury and it would be error to grant judgment notwithstanding the verdict. Here, there was substantial evidence which, considered in the best light for appellee,[40] supported the jury verdict of $40,000.

Regarding the motion for a new trial, the rule stated in Ahlstrom v. Cummings, 388 P.2d 261, 262 (Alaska 1964), and approved in State v. 45,621 Sq. Feet of Land, *supra,* is:

> The matter of granting or refusing a new trial rests in the sound discretion of the trial judge. We shall not interfere with the exercise of his discretion except in the most exceptional circumstances and to prevent a miscarriage of justice.

Here, the jury verdict was not clearly unjust and was within the range of testimony offered.[41] It was not error for the trial judge to deny the motion.

Finally, appellants make the following cursory argument:

> Thus, in addition, the Appellants are entitled to receive any damages to the remaining portion of the property, less special benefits. Since the jury made no determination as to this point, the court can decide on this point or remit for a new trial.

There is no indication in appellants' brief that an objection was made to the form of the verdict, no authority is cited, and there is no error assigned in the points on appeal. We deem the point waived.[42]

The judgment of the trial court is affirmed.

39. *See* Alaska State Housing Authority v. Vincent, 396 P.2d 531 (Alaska 1964).

40. Otis Elevator Co. v. McLaney, 406 P.2d 7, 9 (Alaska 1965).

41. *See* Alaska State Housing Authority v. Vincent, 396 P.2d 531, 535–536 (Alaska 1964).

42. Supr.Ct.R. 11(a).