T. H. BROWNING STEAMSHIP COMPANY, Inc., a Michigan Corporation, Appellant,

v.

F. H. PEAVEY & COMPANY (a Corporation), Appellee.

No. 15509.

United States Court of Appeals Eighth Circuit.

July 6, 1956.

Rehearing Denied Aug. 6, 1956.

Sparkman D. Foster, Detroit, Mich. (Foster & Meadows, Detroit, Mich., Dancer, Montague, Applequist, Lyons, Nolan & Nordine and Patrick J. Lyons, Duluth, Minn., and John Arthur Hamilton, Detroit, Mich., were with him on the brief), for appellant.

Daniel H. Mundt, Duluth, Minn. (McCabe, Clure, Van Evera & Donovan, Roger W. Spencer, Duluth, Minn., A. C. Remele, and J. K. DeWerff, Minneapolis, Minn., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and VOGEL and VAN OOSTERHOUT, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

Respondent, T. H. Browning Steamship Company, Inc., appeals from a final judgment in favor of libelant, F. H. Peavey & Company, hereinafter sometimes called Peavey, for damages to Peavey's dock, alleged to have been caused by the negligent operation of respondent's steamship, the Browning. This action was brought in admiralty pursuant to 46 U.S.C.A. § 740. This court has jurisdiction.

The evidence bearing upon the issues of negligence and contributory negligence is detailed and conflicting. In its initial brief respondent made the contention that an admiralty appeal is triable de novo. The parties now apparently agree that the findings of the trial court should not be set aside unless clearly erroneous. Such is the law. In McAllister v. United States, 348 U.S. 19, at page 20, 75 S.Ct. 6, at page 8, 99 L.Ed. 20, the Supreme Court speaking of the scope of review in admiralty cases states:

"* * * In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. [Cases cited.] A finding is clearly erroneous when ' "although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." ' * * * *"

We will not attempt to review the facts in detail, but we look to the record to ascertain whether the court's findings and conclusions are supported by substantial evidence, bearing in mind the rule that the evidence must be viewed in the light most favorable to the party prevailing in the trial court.

Upon the issue of negligence the court found that the master of the Browning was negligent in conducting a dock test lasting for a period of approximately one and one-half hours while the ship was moored to the Peavey dock, and that such

dock test was the proximate cause of the undermining of the Peavey dock and resulting damage.

Peavey owned a large grain elevator upon the lake front at Duluth and maintained a dock adjacent to the elevator to facilitate the loading of grain from its elevator into ships. This dock was built in 1899 and was of crib construction, the cribs extending 24 feet below low water datum to the lake bottom and being filled with sand and silt and anchored to each other and to piles driven into the lake bottom. Many of the docks in the Duluth harbor are of this type of construction. The Browning had been towed to the Peavey dock on April 3, 1952, for loading. The ship had undergone a major overhaul during the winter at Knudsen dock, and such repairs were completed by Knudsen's employees while the ship was at the Peavey dock. The Browning, after receiving a load of 6,656 tons of grain, had a draft at the stern of 20 feet 4 inches. Its propeller, consisting of four blades, was 11½ feet in diameter. On the afternoon of April 4, after the completion of the overhaul job, a dock test of the Browning was conducted. This consisted of operating the ship's propeller forward and backward at varying speeds while the ship was tied to the Peavey dock. The respondent admits that the dock test ran for 45 minutes. The trial court on conflicting evidence found that the dock test lasted for approximately one and one-half hours. The trial court states:

"In the exercise of reasonable care, the master of the Browning should have known that the movements of the propeller for that length of time in the performance of a dock test would have a tendency to scour and dissipate large quantities of the soil in the slip alongside the dock. That substantial scouring of the slip resulted from the dock test seems fully sustained by the evidence."

The master of the Browning admits that he knew the lake bottom in the Duluth dock area was sandy or muddy silt upon which the operation of the propeller would have a scouring effect. No permission for running the dock test was sought or obtained, and no effort was made to learn of the dock's construction or to ascertain the depth of the water adjacent to the dock. The Peavey dock was a private dock maintained for the purpose of loading ships from the Peavey elevator and was not a repair or test dock.

A careful consideration of all the evidence leads us to the conclusion that the trial court's finding that the master of the Browning failed to exercise ordinary care in conducting the dock tests is supported by substantial evidence.

The evidence likewise adequately supports the trial court's determination that the aforementioned negligence was the proximate cause of the damage to the Peavey dock. It is undisputed that the dock began to cave in just as the Browning pulled away from it. The Browning was the first ship to use the dock in the 1952 season, and a number of heavy trucks had traveled over the dock on the day of its collapse. Observation by a diver and soundings made after the accident established that a large scoured hole, 22 feet long and 29 feet below the low water datum, was found at the point which had been occupied by the stern of the Browning during the dock test. Expert evidence, although contradicted, also established that the scouring by the Browning's propeller caused the undermining of the cribs supporting the dock.

Respondent next urges that the court's finding that Peavey and its employees were free from negligence which contributed to the damage is not supported by substantial evidence. Both parties cite with approval language from Aide v. Taylor, 214 Minn. 212, 7 N.W.2d 757, 761, 145 A.L.R. 530, as follows:

"Contributory negligence, like negligence, is the failure to exercise due care to guard against harm reasonably foreseen or anticipated. * * *"

We shall apply such test to the evidence.

The respondent contends that Peavey should have placed a sign upon its dock, warning against the operation of the

propeller, and that Peavey or its employees should have warned the ship's master not to turn the wheel. A warning sign had been placed on the dock prior to 1938. The master of the Browning had not been aware of the previous existence of a sign, so he was in no way misled by its removal in 1938. Some of Peavey's employees observed the Browning's wheel operating. It was the usual practice to warm up ships' engines by using their wheel for a period of 5 to 15 minutes. This, however, is entirely different from a prolonged post-overhaul dock test such as was made here. The trial court states:

"* * * However, there was no duty resting upon the elevator owner to warn masters of vessels trading at this dock of the danger to the dock of a dock test or of prolonged operation of the propellers of their vessels. That danger was evident to any master operating vessels in the Duluth Harbor area. The scouring effect of propellers was common knowledge to everyone handling vessels in that area. * * Common prudence and good seamanship would suggest to any master of a vessel of the size of the Browning that, with a prolonged dock test, a propeller weighing many tons would be apt to produce pronounced scouring in the slip and the undermining of the adjacent dock. * * *"

We do not believe that the facts here before us compel a conclusion as a matter of law that Peavey was bound to anticipate that an experienced master of a large ship, familiar with the harbor, would run an extensive dock test without first seeking permission so to do, or without taking proper steps to ascertain that such test could be safely conducted without injury to the Peavey property. In Ford Motor Co. v. Bradley Transportation Co., 6 Cir., 174 F.2d 192, defendant's ship in maneuvering away from plaintiff's dock struck and damaged a coal unloader located on the dock. Defendant introduced evidence to the effect that at other docks it was usual to move away the coal unloaders when ships were maneuvering. The court held that the failure to move the coal unloader did not constitute contributory negligence, stating at page 196:

"* * * Plaintiff was not bound to assume possible negligence on the part of the Bradley, nor was it bound to take any action with reference to a navigation operation which was wholly within defendant's control."

■■ The issue of freedom from contributory negligence ordinarily presents a question of fact rather than a question of law. Nees v. Minneapolis Street R. Co., 218 Minn. 532, 16 N.W.2d 758, 761; Merchants Motor Freight v. Downing, 8 Cir., 227 F.2d 247, 251. The court's conclusion that Peavey was free from negligence contributing to its damage is supported by substantial evidence.

■ Respondent urges that damages allowed in the amount of $49,132.87 are excessive and unwarranted in law. The applicable measure of damages is stated by the trial court to be "The reasonable cost of repair of the dock to its original condition". There is evidence in the record that the value of the dock before the damage was inflicted was in excess of the cost of repairs. While the dock had been in service many years, it is agreed that the underwater portion of the dock had not deteriorated. Before the dock test the dock was in good serviceable condition. Under such circumstances the rule of damages followed by the trial court was proper. O'Brien Bros. v. The Helen B. Moran, 2 Cir., 160 F.2d 502, 505, Annotation, 12 A.L.R. 902, 923. One hundred seventy-five feet of the dock on the bay end was severely damaged. Respondent was consulted with reference to the repairs to be made. Buck, the contractor who repaired the dock, testified that it would cost $85,000 to rebuild the dock by repairing and realigning the cribs which had tilted out of position as much as four feet, and that there was some doubt whether such repairs could be satisfactorily accomplished. Upon Buck's recommendation, fill

was used to stabilize the dock to stop tilting and sinking, and steel piles were driven in to support the damaged cribs. In some respects the dock was better than it was before the accident, particularly in that the steel piles would tend to prevent an accident such as the one that had just occurred, and possibly larger ships could now use the dock. On the other hand the evidence discloses that there is a definite jog in the dock as repaired which detracts from its value, and Buck testified that it was doubtful whether the repaired dock was better structurally than the former one due to the fact that the present structure is dependent upon reinforced steel anchor rods located under water. Upon the improvement issue the court states:

" * * * In any event, libelant, through the negligence of the respondent, was confronted with an emergency; that is, it was required to accept the repair materials which were available. If perchance the present dock is, from some considerations, a superior dock, that became unavoidably necessary because libelant had to procure the type of material which was available to it, and any delay in making repairs may well have resulted in considerably more damage."

Particular complaint is made about replacing the concrete cap upon the damaged portion of the dock at a cost of $17,-500. The original dock had a concrete cap. The undamaged portion of the dock was still covered with the original concrete cap. The court held in effect that as part of the repairs Peavey was entitled to have the concrete cap replaced even though the dock might have been serviceable without it.

 The damages allowed were quite liberal. However, there is no dispute about the expenditures required to make the repairs, and there is no evidence of any kind that the repairs could have been made more economically in any other way. As stated by the trial court, "Respondent offered absolutely no evidence whatsoever on this matter." We con-

clude that the findings of the court upon the damage issue are supported by substantial evidence and are not clearly erroneous.

 Erickson, a chief engineer upon a Great Lakes ship, in response to an inquiry as to the general practice and custom in use in the Great Lakes area relative to dock tests, stated:

"Prior to proceeding with the dock test you get permission from whoever is in charge of the dock and if permission is granted you shift your ship to the end of the dock, outward end. Then the mate takes care of securing lines and securing the ship to the dock and you proceed to work your engine."

Respondent objected to such testimony on the ground that evidence of custom could not be offered because custom was not pleaded. The court inquired:

"How are you going to determine what the standard of care in conducting a dock test is? Isn't it what the ordinary practice that engineers and masters follow in conducting dock tests in this area?"

The testimony was admitted. Later, respondent moved to strike the testimony because of lack of qualification on the part of the witness. The witness had been a seaman on the Great Lakes since 1931 and a chief engineer for a number of years. The cross-examination may have detracted from the weight to be given the testimony, but there is no abuse of discretion in refusing to strike the testimony. Respondent in support of its contention that custom should be pleaded cited The Governor Warfield, D.C., 39 F.2d 926. This case does contain a statement that custom as a defense must be pleaded. However, in our present case custom is not being urged as a defense. The court in The Governor Warfield case goes on to find that even if the custom urged was established the defendant was negligent. In Miller v. The Sultana, 2 Cir., 176 F.2d 203, evidence was introduced of a custom to replace the hatch when elevator employees reached the deck of the hold. On the question of ad-

missibility of evidence as to custom the court states at page 206:

"No such custom had been pleaded, but the admission of evidence of the custom was within the Court's discretion. If any surprise resulted, request for time to meet the evidence might have been made. This was not done."

In Terminal R. Ass'n of St. Louis v. Schorb, 8 Cir., 151 F.2d 361, certiorari denied 326 U.S. 786, 66 S.Ct. 470, 90 L. Ed. 477, evidence of custom in shunting railroad cars was admitted. As to the necessity of pleading custom, this court states, 151 F.2d at page 364:

"The general rule is that where a custom is merely incidental and is relied on only as evidence of some other fact in issue, it need not be pleaded. 25 C.J.S., Customs and Usages, § 32, p. 125, and cases cited under note 11."

The court also quotes from Chicago Great Western R. Co. v. Minneapolis, St. Paul & S. S. M. R. Co., 8 Cir., 176 F. 237, the following, 151 F.2d at page 364:

"'* * * The best test of reasonable care in a given case is evidence of the degree of care which such persons commonly exercise under similar circumstances where such evidence is available. * *'"

In Texas & Pacific Railway Co. v. Behymer, 189 U.S. 468, at page 470, 23 S.Ct. 622, at page 623, 47 L.Ed. 905, Justice Holmes states:

"* * * What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not. * * *"

■ We are inclined to think that the court did not abuse its discretion in admitting the testimony as to the usual manner in which dock tests are conducted. Such evidence is in the record for such aid as it may furnish the court in passing on the question of whether the master of the Browning in making the dock test exercised reasonable care. There is also in the record other evidence as to the method of making dock tests. Gustafson, who had served for 26 years in the Army Engineers Office in Duluth, testified that ships had difficulty in finding docks at which they could run dock tests, and that upon request he had permitted such tests at the Government dock under close supervision and upon the condition that the stern was kept as far out as possible from the end of the dock. The Browning's chief engineer admitted that in certain areas the stern would be shifted away from the dock before engaging in the dock test, but denied knowledge that such practice was customary. In any event, we are satisfied that there was ample evidence exclusive of the evidence of custom to support the court's findings, and that if error was committed in receiving this evidence it was not prejudicial. Builders Steel Co. v. Commissioner, 8 Cir., 179 F.2d 377, 379.

■ Finally, respondent complains that the trial court did not comply with Admiralty Rule 46½, 28 U.S.C.A., requiring findings of fact and separate conclusions of law. This issue was raised by respondent's request for specific findings and by objections to findings proposed by libelant and exceptions to the court's memorandum decision. The court made 25 numbered findings of fact and, in addition, filed two memorandum opinions which are made a part of the court's findings. A careful examination of the court's findings, including the memorandum opinions, convinces us that the court has complied with Admiralty Rule 46½. The findings made are supported by substantial evidence and justify the conclusions reached by the trial court.

The judgment appealed from is affirmed.