**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Tobias EBINGER, doing business under the name of N. Roth Plumbing & Heating Co., Defendant-Appellant.**

**No. 151, Docket 31656.**

United States Court of Appeals
Second Circuit.

Argued Oct. 26, 1967.

Decided Dec. 5, 1967.

Vincent A. Catoggio, New York City (Purdy, Lamb & Catoggio, New York City, Eugene L. Sugarman, New York City, of counsel), for appellant.

Lawrence W. Schilling, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern District of New York) (Michael D. Hess, Asst. U. S. Atty., of counsel), for plaintiff-appellee.

Before FRIENDLY, KAUFMAN and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

Appellant, 'Tobias Ebinger, who undertook an $880 plumbing job on the water cooling tower of a government building in Brooklyn in February 1960, finds himself on the paying end of a judgment for damage he is claimed to have done, in the amount of $34,867.84, along with interest from July 30, 1963, when the action was brought, and costs. The woe thus naturally engendered is aggravated by the circumstance that Judge Levet, before whom the case was tried in the District Court for the Southern District of New York, had said during the trial that he was "tempted to grant" a defense motion to dismiss the complaint for inadequacy of proof. We find no sufficient basis for setting aside the trial judge's conclusion as to liability; however, we believe his award of damages to the United States was unduly generous.

The job on which Ebinger, unhappily for himself, was the successful bidder was the installation of two "CEPI Water Conditioning Units" in the water lines of a cooling tower on the roof of a government building in Brooklyn. A water pipe ran from the roof up the outside of the cooling tower. The specification included the following direction:

"Support: Weld two heavy angle bracket supports on the existing fitting of the 10 inch pipe at the cooling tower, or a saddle, and use two 3 inch angle irons for the upright supports to be anchored to the steel structure of the cooling tower. This support shall be installed in such manner to not interfere with the removal of the CEPI Unit. The upright of the support may be welded to the steel structure of the Tower. If bolted, the holes shall be drilled, not burned with a torch."

The lower portion of the sides of the 20' tower consisted of horizontal metal louvres; above these the tower was composed of squares of steel. The interior space on the level of the louvres was empty but the space above them was filled for 8' by redwood baffles generally some 3"–6" from the interior walls although touching them in some spots. These inside walls had been sprayed with a synthetic rubber substance having an ignition point of 600° F. In order to discharge his obligations under the quoted paragraph Ebinger hired a welder, Berkel, who was sent by the United States Employment Service; they chose to affix the bracket supports to the wall of the tower a few feet above the louvres. The welding raised the temperature of the inside of the steel wall to about 2000° F. At 4:45 P.M. in the afternoon of that winter day an employee of the General Service Administration discovered a fire in the tower, manifested by smoke and crackling near the place where the supports had been fixed. Much damage was done.

The judge found that the welding had ignited the synthetic rubber coating and that the fire had then spread to the ceiling and the highly inflammable redwood baffles. He concluded that Ebinger had been negligent, had selected a place for fixing the bracket different from that required by the specification, and had otherwise breached his implied warranty of workmanlike performance. He also concluded that Ebinger had failed to show contributory fault by the Government or, in the alternative, that this was not a proximate cause of the fire and in any event would not bar the action for breach of warranty. Finding that the cost of buying a new tower was less than that of repairing the old one, he allowed the entire amount so expended save for an item, not claimed by the Government, covering a fire protection sprinkler system not previously provided.

 Ebinger's most basic claim is that the evidence was insufficient to meet the Government's burden of showing that the welding caused the fire. The Government buttressed the natural inference from the events with expert testimony by a former Superintendent of the Bureau of Fire Prevention of the New York Board of Underwriters that

the high temperature generated by the welding would ignite the coating and that the resulting fire would spread to the redwood baffles within 15 or 20 minutes after completion of the welding. Furthermore, Friedland, one of the building employees, testified that when he and Ebinger stood on the roof watching the firemen extinguish the blaze, he said to Ebinger, "I told you you'd burn down the tower," to which Ebinger replied, "You said it all right." Ebinger denied having this conversation, and he and Berkel also testified that the welding of the supports was finished not later than 3:45 P.M., but the trial judge did not credit these statements. It is no objection to the finding of causation that, except for the testimony as to Ebinger's statement to Friedland, the evidence linking him to the fire was circumstantial; even purely circumstantial evidence may properly be found to outweigh conflicting direct testimony. Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825, 839 (1941); The Rocona v. Guy F. Atkinson Co., 173 F.2d 661, 665 (9 Cir. 1949). The combination of the common-sense inference that it was Ebinger's welding that caused the fire, cf. Achilles v. New England Tree Expert Co., 369 F.2d 72, 73 (2 Cir. 1966), the expert testimony, and his inculpatory statement sufficiently support the finding of causation; in any event it is not "clearly erroneous," F.R.Civ.P. 52(a).

■■ Since the Government required less to prevail on the theory of breach of contract, including the implied warranty of workmanlike performance, than on that of negligence, we need consider only the former. Ebinger conceded that he saw the coating on the inside of the tower before the welding began. However, he denied knowledge that the coating was inflammable and stresses the failure of the Government to give specific warning and the language of the specification that "the uprights of the support may be welded to the steel structure of the tower." As against this the GSA engineer in charge of the work had told Ebinger that there was to be no smoking around

the tower and that the welding was to be done with an electric outfit, and also that Ebinger was to let him know before starting work on the tower, which Ebinger did not do. Further, Friedland, the GSA maintenance and operation foreman, had warned Ebinger that he had to make preparations against fire, although stressing the redwood baffles rather than the coating. Ebinger's knowledge sufficed at the very least to demand that he carefully inspect the tower before leaving it, and the judge did not clearly err in finding he failed to do this. Moreover Ebinger's argument as to the specification is drained of its apparent force by the Government's contention—which the judge was justified in sustaining in light of the language and the testimony, despite the rule of *contra proferentem*— that the direction to weld supports "on the existing fitting of the 10 inch pipe at the cooling tower" required that the work be performed where there was a "fitting" rather than elsewhere on the pipe, and that if Ebinger had done this, "the point of the welding would have been accessible from inside the tower, and inspection and fire precautions, such as scraping off the coating at that point, would have been possible." On this reading of the contract it becomes immaterial whether Ebinger was guilty of other defaults and whether the Government's failure to give specific warning as to the inflammable nature of the coating would bar recovery for them. Cf. Williams v. Pennsylvania R. R., 313 F.2d 203, 213–214 (2 Cir. 1963).

■ Although Ebinger does not question that it was cheaper to procure a new tower than to repair the old one, he claims that the value of the tower before the fire constituted the limit of the Government's recovery. The cases on which he relies, of which O'Brien Bros., Inc. v. The Helen B. Moran, 160 F.2d 502 (2 Cir. 1947), is an example, are based on the rationale that the plaintiff could have held its loss to the value of the property before the damage by abandoning rather than repairing it. This reasoning has no application when the dam-

aged unit is an essential part of a larger whole. Despite the fact that the water tower was located above the building rather than within its four walls, it was a necessary and integral part of the building's air conditioning system. Under such circumstances it has been generally held that the defendant is not entitled to a credit merely because the plaintiff has acquired a new unit, presumably with a longer life expectancy than the old, if that was the cheapest course available. The Baltimore v. Rowland, 8 Wall. 377, 75 U.S. 377, 385–386, 19 L.Ed. 463 (1869); J. W. Paxson Co. v. Board of Chosen Freeholders, 201 F. 656, 663 (3 Cir. 1912); Shepard S.S. Co. v. United States, 111 F.2d 110, 113 (2 Cir. 1940). This can be justified by the consideration that the plaintiff should not be required to finance in part the premature replacement of equipment when there is no assurance that this will add to the realizable value of the property to which it appertains. It is true that, as Judge Chase noted in Shepard S.S. Co. v. United States, supra, "much might be said logically to the contrary," and we are not sure we would apply the established rule when this would be clearly inequitable, e. g., in a case where the damaged part was scheduled for early replacement, long before the expiration of the useful life of the whole. Here, however, the judge found that the old tower had "a useful life expectancy of 20–25 years or perhaps longer" and while he estimated a somewhat longer useful life for the building, any increment in value by avoiding the possible need to replace the water tower a quarter of a century hence would be small and speculative.

On the other hand, the trial court should have allowed credit for the maintenance expenses the new tower will save. There was evidence that the old tower had been cleaned and lined in 1959 at a cost of $12,000, and the record suggests that this process might have to be repeated as frequently as every five years. With the new tower, on the other hand, a government witness testified that "the corrugated cement asbestos boards as opposed to the steel doesn't require any maintenance" and that "the hot dipped galvanized frame with the proper water treatment does not require any periodic painting such as a steel frame requires." On the basis of this testimony, the judge found that the new tower "was to some extent more economical to maintain." The Government should not have the benefit of this at Ebinger's expense, particularly since a saving of this sort would be reflected in the sale price of the building unless, of course, it were to be scrapped. The judge should thus have proceeded to determine as nearly as possible the amount of this saving and to deduct an amount not exceeding its capitalized value. For, as we stated in Harris v. Standard Accident and Ins. Co., 297 F.2d 627, 631–632 (2 Cir. 1961),

> The purpose of tort damages is to compensate an injured person for a loss suffered and only for that. The law attempts to put the plaintiff in a position as nearly as possible equivalent to his position before the tort. Recovery is permitted not in order to penalize the tortfeasor, but only to give damages "precisely commensurate with the injury."

Perhaps, in light of what we have said, the parties will be able to avoid further labor by judges and lawyers on this unfortunate incident nearly eight years past; the exhibition of some quality of mercy by the Government would not be misplaced.

The judgment as to liability is affirmed; the judgment as to damages is reversed in part and the cause remanded for a redetermination of damages in accordance with this opinion. No costs on appeal.