FREEPORT SULPHUR COMPANY, Plaintiff-Appellee,

v.

The S/S HERMOSA, her engines, tackle, apparel, furniture, etc., in rem, et al., Defendants,

Pansuiza Compania de Navigacion S. A., in personam, Defendant-Appellant.

No. 74–1581.

United States Court of Appeals, Fifth Circuit.

Jan. 23, 1976.
Rehearing En Banc Granted April 30, 1976.

Walter Carroll, Jr., New Orleans, La., for defendant-appellant.

James B. Kemp, Jr., Richmond Eustis, John W. Sims, New Orleans, La., for plaintiff-appellee.

Before WISDOM, SIMPSON and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

During the early morning hours of March 21, 1971, the S. S. Hermosa, while attempting to moor at a dock owned by the Freeport Sulphur Company (Freeport), struck the upstream end of the dock, causing severe damage to the structure. The district court held the shipowner, Pansuiza Compania de Navigacion, S. A. (Pansuiza), liable. *Freeport Sulphur Co. v. S/S Hermosa,* E.D.La.1973, 368 F.Supp. 952. Pansuiza does not contest its liability per se;[1] the dispute in this case relates to the district court's calculation of damages.[2]

---

1. The ship and its owner are subject to the presumption of fault against a moving vessel that strikes a stationary object, such as a dock. *The Oregon,* 1895, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943, 949; *Skidmore v. Grueninger,* 5 Cir. 1975, 506 F.2d 716, 721; *Canal Barge Co., Inc. v. Griffith,* 5 Cir. 1973, 480 F.2d 11, 17. The record supports the finding that "the dock was suitably built" and that Pansuiza offered "no explanation for the impact. . . . Liability for the resultant damage is therefore clear." 368 F.Supp. at 953.

2. Because the cause of action arises under the maritime law, the damages issues are decided under federal rather than state law. *See Robinson v. Pocahontas, Inc.,* 1 Cir. 1973, 477 F.2d 1048, 1052–53; *Petition of United States Steel Corp.,* 6 Cir. 1970, 436 F.2d 1256, 1278, *cert. denied,* 1971, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153; *Canova v. Travelers Insurance Co.,* 5 Cir. 1969, 406 F.2d 410, 412, *cert. denied,* 1969, 396 U.S. 832, 90 S.Ct. 88, 24 L.Ed.2d 84.

First, of the $84,141.20 Freeport is alleged to have paid for the reconstruction of the dock, it claims about $16,000 as the cost of engineering work performed by its employees. Pansuiza argues that this is an inflated figure and that in-house services cannot properly be included as an element of damages.

Second, the district court found that the value of the dock was enhanced by its reconstruction, because the repairs extended the useful life of the dock. In deducting the cost of this improvement from Freeport's compensation for its repair expenses, the district court rejected the straight-line depreciation formula commonly used in calculating the costs attributable to the extension of useful life and instead relied on a formula based on the "percentage of useful life extension". Pansuiza contests the court's adoption of this "novel", "unsupported. and unsupportable" theory and asserts, moreover, that the court improperly applied its own formula.

Third, Pansuiza objects to the compensation that was awarded to Freeport because, as a result of the collision, Freeport paid for the useful life extension much earlier than such an expenditure would otherwise have been necessary.

### I

Pansuiza's objections to the inclusion of the labor and overhead costs of Freeport's engineering department in the damages award are twofold. First, it asserts that Freeport's use of its own salaried engineers and draftsmen did not involve any additional cost or expense. Second, it argues that the claim for engineering expenses was an inflated figure.

■ Freeport has arranged with an independent engineering concern to be furnished supplemental personnel when its own salaried engineering staff is overworked. Because Freeport found it un-necessary to tap this outside during the period of the engineering work on the dock, Pansuiza contends that, were it not for the dock work, Freeport's engineers would have been idle or engaged in essentially nonproductive work. Pansuiza argues, therefore, that the engineering work was performed without any additional expense or overhead. We reject this argument as being wholly based on speculation. It is at least as plausible that there were other Freeport projects that would have been worked on by Freeport's internal engineers, but were not of such an emergency nature that they required the immediate employment of the outside firm.[3]

■ In support of its argument that Freeport's engineering expenses were excessive, Pansuiza cites a $10,000 estimate of engineering costs made by Freeport's engineering department after receiving bids for the reconstruction work. The $6000 by which this underestimated Freeport's actual engineering expenses is explainable, however, by the fact that the estimate was made before the actual reconstruction was completed and the costs calculated.[4] Pansuiza also draws our attention to the testimony of its expert witness that engineering expenses on similar projects average 10 to 15 percent of the total construction costs, but that the engineering expenses claimed by Freeport were about 22 percent of such costs. This discrepancy may be explained by the fact that Freeport's engineers provided alignment and grading usually provided by the contractor. If that portion of the engineering costs attributable to alignment and grading (roughly $3500) were deducted from the engineering costs, these costs would be brought down to the range that Pansuiza's expert witness indicated was the norm. The district court found that Freeport's "hourly records were properly kept"; that its records were "accurate

---

**3.** A Freeport senior project engineer testified that if the Freeport engineers had not been working on the dock, "they would have been doing other work in the department".

**4.** The Freeport engineer who made the estimate contended that this was the reason for its inaccuracy.

and its charges reasonable"; and that had "it resulted in a net saving, the benefit would have inured to the defendant". The findings were not clearly erroneous.

■ The cost of repairs performed internally by the injured party, including overhead, are recoverable in a negligence action. See Baltimore & Ohio Railroad Co. v. Commercial Transport, Inc., 7 Cir. 1960, 273 F.2d 447, 448–49; Crain Brothers, Inc. v. Duquesne Slag Products Co., 3 Cir. 1959, 273 F.2d 948, 953; Ford Motor Co. v. Bradley Transportation Co., 6 Cir. 1949, 174 F.2d 192, 198. The district court properly concluded that Freeport was entitled to recover its in-house engineering costs.

## II

■ The purpose of compensatory damages in tort cases is to place the injured person as nearly as possibly in the condition he would have occupied if the wrong had not occurred. See Restatement of Torts § 903, comment a at 60 (Tent. Draft No. 19, 1973); C. McCormick, Damages 560 (1935). When there is a tortious injury to property and the market value of that property is unknown, the amount of damages must be determined by the cost of repairs to the property. See D. Dobbs, Law of Remedies 392 (1973); F. Harper & F. James, The Law of Torts 1311–12 (1956). These two principles are in apparent conflict when the repairs that are necessary to correct damage caused by negligence enhance the pretort value of the plaintiff's property. In such a case, the increase in value is deducted from the plaintiff's recovery for the cost of repairs.[5] A major issue in the present case is the method of computing the increase in the value of Freeport's dock that was caused by its reconstruction following the collision. .

■ The only betterment to Freeport's dock that was proved is the extension of its remaining useful life. The district court found, as a matter of fact, that the precollision remaining useful life of the dock was 25 years, but that the repairs had extended its useful life to 35 years. This extension of 10 years in its remaining useful life is a benefit to Freeport that should be deducted from its award.[6]

Pansuiza argues that the "correct, long established, and fair" method of accounting for betterment is to compensate the plaintiff only for those repairs that replace the portion of its property that was undepreciated at the time of the tort. At the time of the collision, the old dock was 16 years old and had a remaining useful life of 25 years. It was thus $^{16}/_{41}$ or 39 percent depreciated. Pansuiza contends, therefore, that 39 percent of Freeport's repair costs of $84,481.20 should be deducted from its recovery. In support of its argument that the straight-line depreciation method of calculating betterment is the "long established" method applied by the courts in cases where the damaged or destroyed property had a definite life span that

5. See Restatement of Torts § 928 (Tent. Draft No. 19, 1973); D. Dobbs, Law of Remedies 392 (1973). In The Baltimore, 1869, 75 U.S. (8 Wall.) 377, 385–86, 19 L.Ed. 463, 465, dicta indicate that, in negligence cases, there should not be any deduction for new materials furnished in place of the old. This dicta has not generally been followed, as the cases cited throughout Part II of this opinion indicate. Two other cases that denied deductions for new replacements and contain equally broad dicta are distinguishable from the present case. In Paxson Co. v. Board of Chosen Freeholders of Cumberland County, 3 Cir. 1912, 201 F. 656, 663, the replacement structure was made of materials inferior to that of the old structure, and it was uncertain whether the new structure was more valuable than the old. And in United States v. Ebinger, 2 Cir. 1967, 386 F.2d 557, 561, the damaged property was an integral part of a larger unit, whose realizable value was probably not enhanced by the replacement.

6. When other types of betterment have been proven, their value has been offset against the plaintiff's award. See, e. g., United States v. Ebinger, 386 F.2d 561 (credit for maintenance expenses saved by new structure); Patterson Terminals, Inc. v. S. S. Johannes Frans, E.D.Pa. 1962, 209 F.Supp. 705, 711 (credit for enlargement of caisson).

had partially elapsed at the time of the accident, Pansuiza cites numerous cases that have applied the formula. *See, e.g., Louisville & Nashville Railroad Co. v. M/V Ciudad de Turbo,* S.D.Ala.1971, 330 F.Supp. 769; *Allied Chemical Corp. v. Edmundson Towing Co.,* E.D.La.1970, 320 F.Supp. 448; *Patterson Terminals, Inc. v. S. S. Johannes Frans,* E.D.Pa.1962, 209 F.Supp. 705; *Jemison v. The Duplex,* S.D.Ala.1958, 163 F.Supp. 947; *General American Transport Corp. v. The Patricia Chotin,* E.D.La.1954, 120 F.Supp. 246.

We stated in *Canal Barge Co., Inc. v. Griffith,* 5 Cir. 1973, 480 F.2d 11, 27, that depreciation is often "a handy tool to reduce the recovery for repair costs to the level necessary to return the injured party to the economic position in which he was found". The underlying issues, however, are whether the repairs extended the useful life of the property and, if so, what portion of the repair costs is attributable to the useful life extension. In *Allied Chemical Corp. v. Edmundson Towing Co.,* prior depreciation was a "handy tool" for measuring the nonrecoverable portion of repair costs. The defendant's tugboat had negligently collided with the piling cluster at the plaintiff's dock, causing the cluster's complete destruction. The cost of its replacement was $3500. When new, both the old and the replaced clusters had life expectancies of 20 years; the old cluster was 3½ years old at the time of the collision. The court awarded the plaintiff damages in the amount of 16½/20 of the replacement cost. Because the damaged piling cluster was completely replaced by a cluster that had a useful life identical with that of the destroyed cluster when it was new, the portion of the destroyed property that had depreciated before the collision accurately measured the extent to which the replacement of the property extended its useful life.

In many of the other cases in which the straight-line depreciation formula has been applied, the court either assumed or explicitly found that the re-paired or replaced property had a useful life identical with the old property when it was purchased by the plaintiff. *See, e. g., Rawls Brothers Contractors, Inc. v. United States,* M.D.Fla.1966, 251 F.Supp. 47, 57; *Patterson Terminals, Inc. v. S. S. Johannes Frans,* 209 F.Supp. at 710; *General American Transportation Corp. v. The Patricia Chotin,* 120 F.Supp. at 249. In many cases, however, courts have improperly reduced the plaintiff's recovery by the percentage of depreciation without giving any indication of the expected useful life of the repaired property. *See, e.g., Louisville & Nashville Railroad Co. v. M/V Ciudad de Turbo; Oakdene Compress & Warehouse Co. v. S/S Cities Service Norfolk,* E.D.S.C.1965, 242 F.Supp. 148; *Jemison v. The Duplex.*

Courts are increasingly recognizing that the "handy tool" of straight-line depreciation should not be used for all occasions. In *Oregon v. Tug Go-Getter,* 9 Cir. 1972, 468 F.2d 1270, for example, the defendant's barge collided with and caused severe damage to the south pier of the plaintiff's bridge. Although the pier was twelve years old and, according to the district court, had a precollision useful life expectancy of eighteen years, the Court of Appeals awarded the plaintiff the full cost of repairs. The court reasoned that the repairs did not add to the life expectancy of the pier because it was an integral part of the bridge, and, regardless of its condition, would have to be replaced when the bridge required replacement. Other circuits have also recognized that, in certain circumstances, application of the depreciation formula would be inappropriate. *See, e. g., Canal Barge Co., Inc. v. Griffith,* 480 F.2d at 27 (useful life of property not extended by repairs); *United States v. Ebinger,* 2 Cir. 1967, 386 F.2d 557, 561 (realizable value of property not enhanced by repairs).

Thus, where the expected useful life of the property after repairs is the same as it was at the time of its acquisition by the plaintiff, the straight-line depreciation formula should be applied. But where the repairs do not ex-

tend the useful life of the property as it existed just before the collision, there should be no deduction for depreciation. In the remaining cases, of which the instant case is an example, the repairs extend the useful life of the property, but to a different degree from the expected useful life of the property at the time of its acquisition by the plaintiff.

The district judge's solution to these cases—in which we concur—requires the calculation of the percentage of the repair expenses representing the cost of the useful life extension. This he termed the "percentage of useful life extension". 368 F.Supp. at 955. This percentage is the portion of the total useful life of the repaired property that the useful life extension constitutes. The allocable cost of the useful life extension may then be derived by multiplying this percentage by the total repair expenses. If this allocable cost is then deducted from the total cost of repairs, the resulting damages award will precisely compensate the plaintiff for the cost of restoring his property to its precollision condition.[7]

■ In the present case the precollision useful life of the dock was 25 years. As a result of the repairs this expected useful life was increased by 10 years. The percentage of useful life extension is thus $^{10}/_{35}$, or 28.6 percent. The district court erred in applying the fraction $^{10}/_{25}$, or 40 percent, to the cost of repairs. 368 F.Supp. at 955. This fraction represents the useful life extension as a percentage of the precollision remaining useful life of the property. As indicated above, however, the proper ratio is that which the useful life extension bears to the remaining useful life of the property after repairs. Because the total cost of the

repairs, $84,141.20, was the cost of obtaining a dock with a useful life of 35 years, the numerator of 10 years should be applied to the denominator of the total number of years of useful life purchased by the $84,141.20 to derive that portion of the total repair costs that is the cost of the 10 year useful life extension.

The cost of repairs that is allocable to the useful life extension is thus 28.6 percent of $84,141.20, or $24,064.38. Deducting this from the total repair costs leaves $60,076.82 as the repair costs recoverable by Freeport.

### III.*

The district court held:

To the extent that depreciation is allowed against the amount of damages, the owner must expend funds for replacement and repair of the dock long before it would have been required to do so in the normal course of business. To reimburse it for capital before it would normally be required to divert funds from operation, it should be allowed interest on the amounts so expended for the remainder of the useful life of the original dock.

368 F.Supp. at 955. The district court reasoned that, were it not for the collision, Freeport would not have had to spend the amount allocable to the useful life extension until 1996, the date at which the useful life of the old dock would have expired. The court therefore awarded Freeport, in addition to other recoveries, the difference between the amount of repairs allocable to the useful life extension and the present worth of that sum of money paid 25 years hence.[8]

---

7. This is subject to the exception discussed in Part III.

* Part III was written by Judge Roney and concurred in by Judge Simpson, author of the original panel decision incorporated in the en banc opinion in *Johnson v. Penrod Drilling Co.*, 5 Cir. 1975, 510 F.2d 234.

8. As indicated in Part II of this opinion, the district court deducted 40 percent ($33,656.48)

from Freeport's repair expenses for the useful life extension of the dock. After determining that the present value of $1 paid 25 years hence is $.18, the court added 82 percent of $33,656.48, or $27,598.31, back to Freeport's award. The net effect was a deduction of 18 percent of $33,656.48, or $6,058.17, for the improvement of the dock. In accordance with our holding in Part II, this amount must be recomputed to accurately state the result of

To the extent that the district court attempts a new measure of damages as a principle of law, reversal is required because the general principle that has been rather universally applied in other jurisdictions, as well as in this Circuit, denies the plaintiff recovery for expenditures that enhance the value of his property. *The Baltimore,* 75 U.S. (8 Wall.) 377, 19 L.Ed. 463 (1869); *Canal Barge Co. v. Griffith,* 5 Cir. 1973, 480 F.2d 11; *Tug June S. v. Bordagain Shipping Co.,* 5 Cir. 1969, 418 F.2d 306; *T. H. Browning Steamship Co. v. F. H. Peavey & Co.,* 8 Cir. 1956, 235 F.2d 5, 8. *See generally,* D. Dobbs, *Law of Remedies* 312–318 (1973) and authorities cited therein.

As a factual matter, the district court based its decision on a finding that the dockowner has suffered damage by being required to expend funds for capital improvements before the time that such funds would have been expended in the normal course of business, but for the accident. Findings of fact will not be overturned unless found to be clearly erroneous. F.R.Civ.P. 52(a). Where findings are not supported by substantial evidence they are taken to be clearly erroneous. *Western Cottonoil Co. v. Hodges,* 5 Cir. 1954, 218 F.2d 158, *reh. den. and modified per curiam,* 5 Cir. 1955, 218 F.2d 163.

In this case, however, we have been unable to find in the record any evidence as to what damage, if any, may have accrued because of the repair costs attributable to the enhancement of the dock's useful life. There is nothing in the record to show: whether the dock might be rebuilt long before it crumbles into the water at the end of its estimated useful life; the extent to which a reasonable return may be obtained on the cost of the enhanced value as on other capital expenditures; the possible savings in the cost of extended useful life construction now as opposed to the possible future cost; the extent to which sinking fund commitments may be reduced by the extended life of the dock and the possible reduction of maintenance costs on the new structure, both of which would tend to lessen the diversion of funds from the operation; the effect on possible loss to the dockowner of the many other considerations that might be relevant to whether the dockowner will suffer any real damage from the early expenditure of funds. It may well be that full evaluation of the damage question would demonstrate no actual damage or that some of the considerations would be so speculative as to be incapable of the reasonable ascertainment required to sustain a damage award. *Cf. Johnson v. Penrod Drilling Co.,* 5 Cir. *en banc* 1975, 510 F.2d 234. In any event, the dockowner offered no proof on this item of damage and there is no support in the record for the conclusion that loss occurred as a result of premature extension costs. In view of the absence of factual support, a court should apply the general rule that a plaintiff is denied consideration for expenditure of repair costs beyond that necessary to restore its property to the condition it was in before the accident.

The extended useful life of the dock may well increase the dock's present value in the amount of the attributable repair cost, so that to follow the district judge's analysis would permit a plaintiff to turn a ready profit from the accident by selling the damaged property immediately after reconstruction and payment of the award. *See General Outdoor Advertising Co. v. LaSalle Realty Corp.,* Ind.App.1966, 218 N.E.2d 141; *compare Restatement of Torts* § 929, Comment b (1939) (suggesting a distinction in damage computation depending on whether damaged property is put to a personal or commercial use).

the district court's holding. Given a 7 percent rate of interest, the present value of $1 paid 25 years hence is $.18. S. Selby, Standard Mathematics Tables 646 (1970). We concluded in Part II that repair costs allocable to the useful life extension were $24,064.38. The present value of that sum paid 25 years hence is thus 18 percent of $24,064.38, or $4,331.58.

The award concerning the present value computation of the extended useful life component of the cost of repairs should be eliminated.

Judge Wisdom's special concurrence in Part III, although reaching the same result as the majority of the Court, follows a line of reasoning which would seem to be foreclosed by *Johnson v. Penrod Drilling Co.*, 5 Cir. 1975, 510 F.2d 234 (*en banc*). First, the Court in *Penrod* expressly provided that

> [t]he calculated gross future earnings must be reduced to present value by the use of an appropriate interest rate prevailing at the time and place of trial.

*Id.* at 237. The validity of discounting to present value of future damages at current interest rates would not appear to be left open by *Penrod*. Second, in *Penrod* we held that inflation is too speculative to be taken into account in the computation of lost future earnings. It would seem, therefore, that inflation is also too speculative to take into account in reasoning to a conclusion concerning damages, *i. e.*, that the interest that would have been earned on the money prematurely invested in enhanced dock value is wholly offset by the degree to which inflation would increase the cost of the useful life extension by 1996.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

WISDOM, Circuit Judge (specially concurring):

I concur in the result reached in Part III of the majority opinion, that is, to eliminate the award to Freeport Sulphur of the interest it lost through its premature expenditure of funds for the useful life extension of the dock. With deference to my brothers, I reach that result by different reasoning.

Pansuiza's primary objection to this portion of the damages award is that prospective interest should not be taken into account unless other criteria that are no more speculative and at least as important are considered.[1] Pansuiza argues, for example, that Freeport has received a windfall because, although it was awarded prospective interest until 1996, it was permitted to replace the dock at the much lower 1971 prices. It concludes, therefore, that if inflation is not taken into account, prospective interest should not be awarded.

This issue is closely analogous to the issue in personal injury cases whether it is proper to reduce the award for loss of future earnings to present value if the estimate of those earnings is not adjusted for inflation. According to the district court's formulation, Freeport should be required to spend (i. e. to have deducted from its total expenditures for damages purposes) in 1971 only the present value ($4,331.58) of the hypothetical payment for the useful life extension of the dock ($24,064.38) 25 years hence.[2] The theory is that if the collision had not occurred and if Freeport had invested $4,331.58 in 1971, that investment would increase to the $24,064.38 cost of the useful life extension by 1996, the date on which such an expenditure would have to have been made if there had been no collision. Similarly, in the personal injury case, the estimate of lost future earnings is reduced to its present value on the theory that, if the present award is invested at prevailing interest rates, it will accumulate to the equivalent of the lost future earnings at the times they would have been received.

The majority rule as to calculation of damages for loss of future benefits requires the reduction of the projected benefits to present value, but prohibits the consideration of inflation. *See, e. g.,*

1. Pansuiza also contends that the district court should not have applied "sophisticated accounting methods" without any basis in the record of factual or expert evidence. The court, however, did receive evidence as to the

present worth of money, and its subsequent offer to accept further evidence or briefs on the issue of an award for lost interest went unanswered.

2. See footnote 8 of the majority opinion.

*Sleeman v. Chesapeake & Ohio Railway Co.*, 6 Cir. 1969, 414 F.2d 305, 307. This approach, however, has been severely criticized.[3] The solution proposed by most of the critics is that adopted by the Alaska Supreme Court in *Beaulieu v. Elliott*, 1967, 434 P.2d 665. *Beaulieu*, a personal injury action for damages sustained in an auto accident, held that the loss of future earnings should not be discounted to present value because "inflation . . . offsets the interest that could be earned on . . . 'safe' investments". 434 P.2d at 671. This solution is the logical successor to our argument in *Johnson v. Penrod Drilling Co.*, 5 Cir. 1975, 510 F.2d 234 (en banc), that,

> if future inflation does cause higher wages, experience predictably demonstrates that higher interest rates on investments which have always accompanied inflation will also occur and this factor will mitigate the failure to include an inflationary surcharge in wage rate calculations.

510 F.2d at 236. In the present case, the inflation-produced increase in future interest rates above the discount rate used by the district court would *mitigate* the windfall to Freeport that would result from our failure to consider the extent to which inflation would increase the 1996 cost of the dock improvements. The refusal to make a present value reduction, however, would almost fully *offset* the windfall to Freeport.[4]

The inflation-produced increase in interest will "mitigate", rather than "offset", any inflation-caused increase in the cost of the dock improvements, because the market interest rate used to discount by the district court includes, apart from its "real interest" component, an element to compensate for the effect of inflation. For example, if the price of capital (the "real rate of interest") is 3 percent per year and investors expect the value of the dollar to depreciate at the rate of 6 percent per year, the market rate of interest will be about 9 percent.[5] The upshot is that, although the cost of the dock improvements will increase to the full extent of inflation through 1996, Freeport's prospective interest on its investment will increase only to the extent of the *increase* in the investors' forecast of inflation.

Because a more complete offset will operate—resulting in a more accurate

3. Henderson, The Consideration of Increased Productivity and the Discounting of Future Earnings to Present Value, 20 N.D.L.Rev. 306, 308–10 (1975); Henderson, Some Recent Decisions on Damages; With Special Reference to Questions of Inflation and Income Taxes, 40 Ins.Coun.J. 423, 428–32 (1973); Comment, Future Inflation as an Element of Damages in Alabama, 5 Cumb.Sam.L.Rev. 72–74 (1974); Comment; Damages for Loss of Future Income: Accounting for Inflation, 6 U.S.F.L.Rev. 311, 314–21 (1972). In approving of the Alaska rule applied in this opinion, one critic has written of the majority rule: "It is a not uncommon phenomenon for concededly impeccable legal reasoning to lead to a result which is irreconcilable with the practicalities of a developing situation. . . . Substantial difficulty arises when the product of the deductive reasoning process becomes enshrined in the common law to such an extent that the practical results are ignored." J. Stein, Personal Injury and Death Actions 331 (1972).

4. Although one circuit has rejected this offset argument in the context of personal injury and wrongful death actions, *Petition of United States Steel Corp.*, 6 Cir. 1970, 436 F.2d 1256, 1280, *cert. denied*, 1971, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153; *Sleeman v. Chesapeake & Ohio Railway Co.*, 6 Cir. 1969, 414 F.2d 305, 307–08, it has been accepted by several courts applying state law. *See Frankel v. United States*, E.D.Pa.1970, 321 F.Supp. 1331, 1346, *aff'd sub nom. Frankel v. Haym*, 3 Cir. 1972, 466 F.2d 1226; *Pierce v. New York Central Railroad Co.*, W.D.Mich.1969, 304 F.Supp. 44, 45–46; *Gowdy v. United States*, W.D.Mich. 1967, 271 F.Supp. 733, 752, *rev'd on other grounds*, 6 Cir. 1969, 412 F.2d 525, *cert. denied*, 1969, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425; *Resner v. Northern Pacific Railway*, 161 Mont. 177, 505 P.2d 86 (1973).

5. *See* R. Posner, Economic Analysis of Law 81–82 (1972); Meiselman, Bond Yields and the Price Level: The Gibson Paradox Regained, *in* Banking and Monetary Studies 112 (D. Carson ed. 1963); I. Fisher, The Theory of Interest 41–44 (1930); and the excellent discussion of the impact of this principle on damages calculations in *Feldman v. Allegheny Airlines, Inc.*, D.Conn.1974, 382 F.Supp. 1271, 1288–93, *aff'd in relevant part*, 2 Cir. 1975, 524 F.2d 384.

measure of damages—if Freeport is awarded no compensation for its premature expenditure of funds, I agree with the Court's holding that there should be no reduction to present value in the computation of the deduction of the cost of the improvements from Freeport's recovery for repair expenses. If the rate of inflation equals the rate of interest Freeport is able to earn on its investments through 1996, the offset will be total and the compensation to Freeport will be complete.

Two factors will probably prevent the offset from being complete. First, in addition to the component of the market rate of interest that compensates for the impact of inflation, there is a "real" component that represents the payment for the use of capital.[6] Second, many economists believe that there will often be a gap between the inflation component and the actual rate of inflation because future depreciation in the value of money is rarely entirely foreseen.[7] "When prices are rising, the rate of interest tends to be high but not so high as it should be to compensate for the rise . . . ." I. Fisher, The Theory of Interest 43 (1930). Because these two factors push the market rate of interest in different directions, the compensation to Freeport will be imprecise under my approach only to the extent of that compound interest on the cost of the useful life extension that is the difference between the two factors. Even when inflation is entirely foreseen, the imprecision in Freeport's compensation will be small, particularly when compared with the inaccuracy that would result if Freeport were awarded prospective interest, but not required to pay the inflated 1996 price of the improvements.[8]

The approach taken in *Feldman v. Allegheny Airlines,* D.Conn.1974, 382 F.Supp. 1271, 1288–98, *aff'd in relevant part,* 2 Cir. 1975, 524 F.2d 384, would provide more exact compensation. *Feldman* was a wrongful death action in which one of the major issues was the ascertainment of the present value of the decedent's prospective earnings. Rather than forecast the impact inflation would have on these earnings, Judge Blumenfeld discounted future earnings, estimated in 1971 dollars, to present value through the use of the inflation-adjusted ("real") rate of interest on "risk-free" investments. Although I admire the theoretical precision of this approach, *see* R. Posner, Economic Analysis of Law 81-82 (1972), I am also concerned with the complexities and speculation inherent in factoring the inflation component out of the market rate of interest.[9] These difficulties in estimating the rate of inflation were one of the concerns compelling our decision in *Johnson v. Penrod Drilling Co.* that inflation

6. For a discussion of the relationship of this component to present value calculations, *see Feldman v. Allegheny Airlines, Inc.,* 382 F. Supp. at 1292–93.

7. *See, e. g.,* Meiselman, *supra* note at 115, 121; I. Fisher, *supra* note 5, at 38 n. 2 (1930); I. Fisher, The Rate of Interest 278–79 (1907); *cf.* M. Friedman & J. Schwartz, A Monetary History of the United States, 1867–1960, at 91–92 n. 5 (1963).

8. In *Feldman v. Allegheny Airlines, Inc.,* 382 F.Supp. at 1293–95, it was found that the average inflation-adjusted rate of interest (i. e. "real yield") on risk-free investments since 1940 was 1.5 percent. If future inflation is wholly compensated for in the interest rates available to Freeport over the next 25 years, its damages award will therefore be inaccurate by about 1.5 per cent (compounded annually) of the cost of the useful life extension. This inaccuracy will be diminished if, as the authorities in footnote 7 have argued, investors underestimate the extent of future inflation. If prospective interest were awarded at the present market rate and inflation were not taken into account, the "inaccuracy percentage" would be the difference between the average annual rate of inflation and the average annual increase in interest rates over the next 25 years. In the past 25 years, the annual increase in interest rates on 10–15 year U.S. government bonds has averaged 0.2 percent and annual inflation has averaged 3.0 percent. *See* 1975 Economic Report of the President 130, 317–18.

9. After determining the inflation-adjusted rate of interest, Judge Blumenfeld observed that "[n]othing is more conclusively established by the instant memorandum of decision than the difficulty of ascertaining the amount of damages due in this case . . . ." 382 F.Supp. at 1295.

should not be taken into account in the computation of lost future earnings. Indeed, Judge Blumenfeld indicated that, if he were not required by Connecticut law to discount future earnings to present value, he might have decided that, because of the speculation inherent in his calculations, the best approach would have been to adopt the Alaska rule that I have applied in this case.[10]

Nevertheless, I recognize that the rule I propose is inconsistent with some of the language in *Penrod*. That case, brought under the Jones Act, holds that, in calculating a damages award for the loss of future earnings, the trier of fact (1) must not take into account future inflation and (2) must reduce the estimate of lost future earnings to its present value through use of an appropriate interest rate prevailing at the time and place of the trial. The focus in *Penrod* was on inflation, not present value, and, to the extent that we considered present value, we determined only the proper interest rate for the district court to take into account in its disposition of the case on remand. We did not consider the impact of our prohibition of the consideration of inflation on the propriety of discounting future benefits to

present value. We should not now read those general remand instructions about present value as forcing us into a substantively indefensible position.

Moreover, my proposed adoption of the Alaska rule would go a long way toward fulfilling the policies enunciated in *Penrod*. We attempted in that opinion to achieve accurate compensation, while preventing the use by district courts of speculative factors such as future inflation, 510 F.2d at 236, 241, and attaining simplified and efficient trial procedures. 510 F.2d at 237. By prohibiting speculation about future interest rates,[11] by relieving district judges of the responsibility to make present value calculations, and by providing more complete compensation than the consider-present-value-ignore-inflation rule, the offset approach would effectively promote these *Penrod* policies.

In addition, I believe that the literal holding of *Penrod* is inapplicable to the present case. *Penrod* is a Jones Act case. The Jones Act incorporates the provisions of the F.E.L.A. The Sixth Circuit has noted that, in F.E.L.A. cases, *Chesapeake and Ohio Railway v. Kelly,* 1916, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed.

---

**10.** [S]ince Connecticut law requires the discounting to present value of damages for the destruction of future earning capacity, . . . [i]t is not open to this Court to decide that the ascertainment of a discount rate has become too speculative to be fair, and that the statutory mandate of awarding 'just damages' for wrongful death . . . would be better served by dispensing with the discounting process altogether.

382 F.Supp. at 1293 n. 30.

**11.** Prospective interest seems to me to be as speculative as future inflation. The premise of the district court's application of the present value formula is that Freeport would have been able to invest $6,058.17 at 7 percent interest for 25 years. The investment would then accumulate to the allocable cost of the useful life extension, $33,656.48. See note 8 of the majority opinion. It may be argued that the consideration of future inflation is more speculative than that of prospective interest because Freeport could, in 1971, have invested

$6,058.17 in a 25-year note at a given interest rate. It is a fact of life that we cannot ignore, however, that investors rarely elect to have their funds tied up in safe investments for such long periods of time. *See, e. g.,* F. Harper & F. James, The Law of Torts 1303–04 (1956).

The award of prospective interest is thus based on the speculation that prevailing interest rates and Freeport's investment capabilities would have permitted the premise of 7 percent interest for 25 years to be fulfilled. Note, Future Inflation and the Undercompensated Plaintiff, 4 Loyola (Chi.) U.L.J. 359, 366–67 (1973). The compensation for Freeport's "premature" expenditure is also based on the premise that Freeport would have desired in 1996 to invest in the restoration or replacement of the dock. It is wholly speculative, however, to forecast today whether Freeport's business will require the dock in 1996 or whether Freeport will even be in existence at that time.

1117, requires the discounting of lost future earnings to present value. *Sleeman v. Chesapeake and Ohio Railway Co.*, 414 F.2d at 307. This narrow holding of *Kelly*, though perhaps justified in 1916, has now lost all support, in part because courts do not take inflation into account in calculating damages awards.[12] I would disapprove of the *Kelly* rationale and confine that case to the F.E.L.A. context in which it arose.[13] *Penrod* also arose in that context (because the Jones Act incorporates the F.E.L.A.) and we were therefore compelled by the Supreme Court precedent to require a discounting to present value. Our recognition of this point is evident in our introduction to the discussion of *Kelly* in the *Penrod* case:

> The United States Supreme Court addressed itself to the problem of reducing to present value lost future earnings under the Federal Employers Liability Act, which is incorporated by reference into the Jones Act, in [*Kelly*].

510 F.2d at 239. The other case relied upon for the present value remand order in *Penrod* is also an F.E.L.A. case, *Blue v. Western Railway of Alabama*, 5 Cir. 1972, 469 F.2d 487. I argue not that this narrow view of *Kelly* and *Penrod* is mandated on the face of those opinions, but that by viewing those cases in a narrow light this Court would be able to achieve a superior substantive result in cases not squarely controlled by them.

The majority attempts to reach the same result that I have by showing that there is no factual basis for Judge Rubin's award of prospective interest. Its most persuasive argument on this point is that Freeport Sulphur may not have suffered any loss through its premature payment of $24,064.38 because it simply invested this in a different type of capital, the useful life extension of the dock. It contends that there is no reason to believe that Freeport Sulphur could not obtain a rate of return on the new investment that would be comparable to the interest it could have obtained by investing the money in an alternative type of capital from 1971 to 1996. I am not persuaded that this argument is economically sound. The dock is an integral part of Freeport Sulphur's business, and it is therefore doubtful that Freeport Sulphur could "turn a ready profit from the accident by selling the damaged property immediately after reconstruction and payment of the award". The only other possible way to obtain a reasonable return on the enhanced value of the dock would be through the rates Freeport Sulphur charges. It is my understanding, however, that Freeport Sulphur does not obtain rents for use of

---

**12.** *See* text and note at note 3 *supra. Kelly* reflects the experience of the last half of the nineteenth century, when the price level fell consistently and the prevailing view was that the earning power of money gave an advantage to a person receiving immediate payment. At least one economist believes that, given rising prices and incomes, the "earning power of money" is now a "myth" and that the purchasing power of money actually decreases over time. He concludes, therefore, that *Kelly* should not be narrowly read both to require reduction to present value and to prohibit the consideration of inflation. Henderson, The Consideration of Increased Productivity and the Discounting of Future Earnings to Present Value, *supra* note 3, at 308–10, Henderson, Some Recent Decisions on Damages; With Special Reference to Questions of Inflation and Income Taxes, *supra* note 3, at 431.

It has also been argued that, rather than setting up an inflexible formula for determining future damages, *Kelly* "represents the recognition of one aspect of the problem of future damages and stands as a ruling in favor of accurate compensation for the injured party". Comment, Damages· for Loss of Future Income: Accounting for Inflation, *supra* note 3, at 319; *accord*, Comment, Future Inflation as an Element of Damages in Alabama, *supra* note 3, at 79; Note, Future Inflation and the Undercompensated plaintiff, *supra* note 11, at 367.

**13.** The Supreme Court has only cited *Kelly* for its present value proposition in two other old F.E.L.A. cases: *Louisville & Nashville Railroad Co. v. Holloway*, 1918, 246 U.S. 525, 528, 38 S.Ct. 379, 62 L.Ed. 867, 869;· *Chesapeake & Ohio Railway Co. v. Gainey*, 1916, 241 U.S. 494, 496, 36 S.Ct. 633, 60 L.Ed. 1124, 1125.

the dock, but that the only rates it charges are for the sale of sulphur. Both because the price of sulphur may be regulated by the government and, in any event, because the plaintiff may not be able profitably to increase the price of sulphur above the profit-maximizing rate it charged before the collision, Freeport Sulphur will probably not be able to recoup its investment in the useful life extension until the period 1996 to 2006.

Perhaps the point of dispute between the majority and me is as to what is needed to carry the burden of proof on the question of damages for prospective interest. The practicalities dictate to me that, by being compelled to spend about $24,000 on a capital improvement that would probably not generate revenues for twenty-five years, Freeport Sulphur suffered a financial loss (assuming we ignore the impact of inflation on the earnings Freeport could have obtained during those twenty-five years). Adding to this practical approach the facts that Judge Rubin declared at trial that he was considering awarding damages for prospective interest and that his request for evidence bearing on that issue went unanswered by the defendant (the plaintiff responded with present value calculations), I do not think that this Court is justified in overturning his award on the ground that "there is no support in the record for the conclusion that loss occurred as a result of premature extension costs". Indeed, we do not require any greater factual basis for the award of prejudgment interest or, in F.E.L.A. cases, for the reduction of the plaintiff's lost future earnings damages by the amount of interest he could obtain by investing his lump sum judgment during the period of lost wages.

Part III of the majority opinion seems to rest on two foundations. One, which I have discussed above, is the asserted lack of a factual basis for Judge Rubin's conclusion that Freeport Sulphur was injured by its premature expenditure of funds. Second, the majority argues that Judge Rubin's award must be reversed on the basis of the universally applied rule that denies the plaintiff recovery for expenditures that enhance the value of his property. I do not believe that this rule alone dictates reversal. Freeport Sulphur is *not* seeking recovery for the cost of the enhancement of its property, the useful life extension. The damages it seeks are wholly separate, i.e., compensation for the interest it has foregone by being compelled by the destruction of its property to invest $24,064.38 in dock construction twenty-five years before this would have been necessary had it not been for the collision. The crucial point is that Freeport Sulphur does not seek compensation for the cost of enhancing the value of its property. According to Judge Rubin's calculations, Freeport Sulphur would in effect be charged for the full cost of the ten-year useful life extension.

To conclude, it is my view that the two foundations of Part III of the majority opinion will not support reversal of the district court's award of prospective interest. I do agree with the majority, however, that Freeport Sulphur should not be compensated for its premature expenditure. I suggest that the reason the plaintiff deserves no compensation is that the prospective interest it could have earned on the $24,064.38 will be wholly offset by the degree to which inflation will increase the cost of the useful life extension by 1996.

Before BROWN, Chief Judge, WISDOM, GEWIN, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE and TJOFLAT, Circuit Judges.

BY THE COURT:

A majority of the Judges in active service, on the Court's own motion, having determined to have this cause reheard en banc,

IT IS ORDERED that this cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.